# Exhibit A



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION


DAVID SANCHEZ, Individually and On
Behalf of All Others Similarly Situated,

     Plaintiff,

vs.          CIVIL ACTION NO. 7:21-CV-203-DC-RCG

TNT CRANE & RIGGING, INC.,

     Defendant.

_____


DAY 1

VIDEOCONFERENCE DEPOSITION OF

DAVID SANCHEZ


TAKEN ON
THURSDAY, SEPTEMBER 22, 2022
9:17 A.M.


BEST WESTERN
601 EAST INTERSTATE 20
MIDLAND, TEXAS 79701

1      Q.    When did your employment with TNT end?  Do you

2    remember?

3      A.    Maybe that was the last year, 2018.  Yeah.  Yeah.

4      Q.    Okay.  So during your first stint at the Midland

5    yard, what was your job title?

6      A.    Crane operator.

7      Q.    Was your -- was your title crane operator for your

8    whole TNT employment?

9      A.    Yes.  Correct.

10      Q.    Did it ever change during your TNT jobs?

11      A.    No.

12      Q.    So what did you do as a crane operator?  What were

13    your job tasks?

14      A.    Which yard?  Specifically, or --

15      Q.    Let's start with the first time in Midland.

16      A.    So our work here is oilfield.  That's what it

17    pertained to.  We'll go to the job, set up, and then stay there

18    for the stint of the job and then break it down and go to the

19    next one.  And, I mean, we would also drive trucks.  We would

20    do -- drive trucks and operate and rig if we needed to.

21      Q.    What's "rig" mean?

22      A.    It's -- it would be the assistance to the operator,

23    the person who is connecting the rigging to whatever object we

24    were lifting.

25      Q.    So how often did you work as a rigger?  Let's start

1  with your first Midland stint.

2      A.   Very rarely.  It would be just to help out short

3  staff.  So we -- we did have riggers hires, riggers.

4      Q.   So you worked as a rigger, like, five or ten times

5  over your time in Midland or more or less?

6      A.   Yeah.  But very rarely, yes.  Correct.

7      Q.   What about in New Orleans or at the Norco yard, was

8  your job at all different from how it was in Midland?

9      A.   The work was different.  It was petro chemical, so

10  refineries, a lot of what we call taxi work which is day-by-day

11  jobs, going to the city, doing we call it tactical use.  Every

12  day is something different, yeah.

13      The Norco, pretty much the same.  You're always

14  operating unless you had to assist, and you could drive a truck

15  also and you could rig.

16      Q.   Did you do more rigging out of the Norco yard?

17      A.   Yes.

18      Q.   About how often were you rigging in the Norco yard?

19      A.   I'd say about maybe a fifth of the time.

20      Q.   Is there any other differences in working in Norco

21  than working in Midland?

22      A.   As your duty, no.

23      Q.   So how long have you worked as a crane operator?

24      A.   About eight years.

25      Q.   So --

1      A.    Spencer.

2      Q.    **Debo Spencer.**

3            **Okay.  And who was the branch manager?**

4      A.    Ken Wenning.

5      Q.    **Can you spell Wenning?**

6      A.    Your guess is --

7      Q.    **You don't have to.**

8      A.    Yeah.

9      Q.    **We can look that up for the court reporter.**

10           **Okay.  And then when you came back to Midland in**

11     **2018, was it the same in terms of the supervisor Levi and then**

12     **John?**

13     A.    John definitely was still the -- the manager. Levi, I

14     forget if he had left.  He was still there.  Yeah. He was still

15     there.  Same -- same people.

16     Q.    **All right.  Do you remember your -- your rates of pay**

17     **when you were at Midland in let's say 2018?  Do you remember**

18     **how much you were paid?**

19     A.    So the second time around, 32 an hour.

20     Q.    **Was there a guaranteed certain number of hours?**

21     A.    No.

22     Q.    **Did you ever have an hour guarantee, like a minimum,**

23     **at the -- at --**

24     A.    At TNT?  No.  We always had to come in.  We were

25     allowed to come.

1    Q.    So how did you get your job assignments when you were

2    working at TNT?  Who did it come from?

3    A.    Dispatch, email, or text.

4    Q.    Did you get overtime if you made more than

5    -- if you worked more than 40 hours in a week?

6    A.    Yes.  After 40 is overtime.

7    Q.    And obviously that's what this lawsuit is about, but

8    do you remember any times where you -- where you worked more

9    than 40 hours and didn't get paid overtime?  And by that I

10    don't mean the issues in this case.  I mean that --

11    A.    Actual --

12    Q.    -- everybody agreed that you worked these hours, but

13    through some snafu you were shorted overtime?  Do you ever

14    remember that happening?

15    A.    No.  No.  Heard other stories many other people were

16    cut time, but I was lucky.

17    Q.    Do you remember any specific individuals who told you

18    those stories?

19    A.    No, not individuals.  Just many people. Different

20    jobs.

21    Q.    At TNT?

22    A.    Yeah.

23    Q.    Do you remember anybody specific?

24    A.    No.  I don't remember anybody specific.

25    Q.    Do you remember who told you these stories?

```
 1      A.    No.

 2      Q.    Okay.

 3      A.    Just, I mean, the lady who did it was Miss Carol. She

 4  was the timekeeper.

 5      Q.    She worked as a timekeeper?

 6      A.    Yes.

 7      Q.    Okay.  Do you remember any specifics about these?

 8      A.    Just many times, you know, oh, man, I've been

 9  shorted, and she didn't tell me anything.

10      Q.    Do you remember anybody ever telling you that they

11  were shorted and they brought it up with Carol but they still

12  didn't get their money?

13      A.    Yes.

14      Q.    Do you remember what they did about it?

15      A.    Complain.

16      Q.    Do you remember any names connected --

17      A.    No.

18      Q.    -- to those stories?

19      A.    No names.

20      Q.    Do you remember what their job titles were?

21      A.    Would have been various; operators, riggers, drivers.

22          THE REPORTER:  If you could, please, Mr. Sanchez,

23  just make sure you're waiting for him to finish his question.

24  Sometimes it gets a little conversational, and it makes it

25  difficult for me to take down the proper notes for the
```

```
 1        A.    Way more.  I mean, every two weeks.  More 'cause I
 2   had a schedule.  You know, rotation.
 3        Q.    You had a more specific schedule starting in 2019?
 4        A.    Yeah.  We had, like, Allegiance, we had a rotation,
 5   two weeks, one week off.
 6        Q.    In 2018 at TNT, did you have a specific rotation
 7   schedule?
 8        A.    No.
 9        Q.    How did you get notice of your shifts? Obviously, you
10   said it was text or email, but how long did you get notice
11   before you were going to be on for a shift?
12        A.    We'd stay in contact throughout the job, and we would
13   know when it's going to finish.  You know, this is going to be
14   the next job.  Also within that year, we would stay with
15   friends in Chevron who I work with that I will stay, so we
16   would just stay with them.  We would know exactly where we're
17   going, when, so --
18        Q.    So during the second stint at TNT in the 2018 time,
19   do you remember what TNT's policy was with respect to recording
20   travel time on your time sheets?
21        A.    Yes.  We just couldn't do it.
22        Q.    Could you ever record travel time on your time
23   sheets?
24        A.    So at the beginning of a job, like, the first day to
25   go out to that location, I would always put that time, how long
```

1   it took me to get from my house to that job, and then after

2   that every day you're going from the man camp to that job, so

3   you wouldn't put any time.  And then just as you went the first

4   day or as I went the first day the last day back to my home, I

5   would put those hours.

6       **Q.   So on the first day, this is -- this would be from**

7   **your -- your Midland apartment to the job, you would record**

8   **that time?**

9       A.   Correct.

10      **Q.   And then if you were staying in the man camp, would**

11  **you record the time back and forth to the man camp?**

12      A.   No.  We would have a set, you know, with the ticket

13  we'd have to only charge a certain amount of hours.

14      **Q.   And then on the last day you would record your time**

15  **from the job back to your Midland apartment; is that right?**

16      A.   Correct.

17      **Q.   So let's talk about when you were staying in the man**

18  **camps.**

19      A.   Mm-hmm.

20      **Q.   Were you compensated for travel time when you were**

21  **staying in the man camp and working on a crane operator job?**

22      A.   For travel?

23      **Q.   Yes.**

24      A.   No.

25      **Q.   Okay.  Where did you hear this policy that you**

1    weren't compensated for travel when staying at the man camp?

2        A.    This would have been just a email just telling

3    everybody.

4        Q.    And how did you find out how many hours you were

5    supposed to put down on the time sheet for jobs when you were

6    staying in the man camp?

7        A.    The dispatch would tell you.

8        Q.    Would they tell you over the phone or would it be in

9    an email or a text?

10       A.    It would have been either email or text.

11       Q.    Now, what was the dispatch telling you when they were

12   telling you the number of hours?  And what I mean by that is,

13   were they telling you how many hours the shift would last, or

14   were they telling you how many hours to put down on your time

15   sheet?

16       A.    Chargeable hours.  They would also vary for different

17   contractors, you know, if they were willing to pay.

18       Q.    What do you mean by that?

19       A.    So at the minimum, let's say you just get 12 hours,

20   but we would also have meetings so you would have to get

21   permission for them to pay that, like, hour and a half

22   switchover.  You know, it's a meeting for day shift, a meeting

23   for night shift, and you would have to stay in case they needed

24   that

25   -- the operator during their meeting.  For instance, Chevron,

1  they had a deal where they would pay that.

2      Q.   So Chevron paid for --

3           THE REPORTER:  I'm sorry.  I -- I missed the end of

4  that statement.

5           THE DEPONENT:  So, for instance, Chevron would pay

6  those -- that time during meetings.

7           THE REPORTER:  May we go off the record for a moment,

8  please?

9           MR. BULLER:  Yes.

10          THE REPORTER:  Okay.  We're off the record.

11          (Whereupon, a recess was taken.)

12          THE REPORTER:  All right.  We're back on the record

13  at 10:35 a.m.  I'd just make -- like to make a quick statement

14  for the record that if everyone could please just speak as

15  loudly as -- as you -- as you can, and make sure to avoid the

16  nature

17  -- or the inclination to get into a conversational setting.

18          You know, make sure to allow each other to finish

19  your statements, and that will help make a clear transcript.

20  Thank you.

21          MR. BULLER:  All right.  Thank you much.

22  BY MR. BULLER:

23      Q.   All right, David.  We're back on.  Is there anything

24  coming out of the break that you remembered during the break

25  that you want to go back and correct or add on to?

1    A.   So as to what they would be allowed to put on their

2    time sheet?

3    Q.   **Not with respect to time sheets, but with respect to**

4    **actually who rides with who to get out there.**

5    A.   Other companies, some, they would actually give 'em

6    company vehicles.  But deciding, I guess, about the same.  I

7    mean, you would always -- the operator would make the decision,

8    you know, to ride with me, regardless if they had their own

9    truck.

10   Q.   **So it's similar in the sense that the rigger and the**

11   **operator decide --**

12   A.   Between them themselves.

13   Q.   **So on a typical day for TNT when you're starting your**

14   **drive, if you were meeting the rigger at the yard, would you do**

15   **anything else at the yard, or would you just pick up the rigger**

16   **and keep going?**

17   A.   We would get fuel for our drive tank, we'd get ice,

18   or we can get water, and also other, for instance, grease to

19   grease and maintain the crane.

20   Q.   **So how long did you normally spend at the yard when**

21   **you were driving to the yard before going to the jobsite?**

22   **We'll start with a frac job.**

23   A.   That could depend, for instance, if you were fueling

24   that day, getting equipment, or some days you may have fuel

25   already, sufficient fuel, and ice and water.  It would take 25

 1  minutes.

 2      Q.   So it takes 25 minutes if you had to get fuel, ice,

 3  water, rigger, and supplies?

 4      A.   Correct.

 5      Q.   And if you didn't have to get some of those things,

 6  it would take less time?

 7      A.   Yeah.   Ten minutes.

 8      Q.   Is it accurate to say the range for stopping at the

 9  yard was somewhere between ten and 25 minutes?

10      A.   Correct.

11      Q.   How many days a week did you have to get fuel for the

12  drag tank on a frac job?

13      A.   Say, every three days.

14      Q.   And how many days a week did you need to get fuel for

15  your truck?

16      A.   Every day.

17      Q.   Where did you fill your truck?

18      A.   Gas stations.

19      Q.   Was your truck gas or diesel?

20      A.   I believe that year I had diesel.

21      Q.   Could you fill your truck from the drag tank?

22      A.   You could, but you're not allowed to.

23      Q.   Was that a TNT rule?

24      A.   Yes.   The fuel is red, also illegal.

25      Q.   What do you mean?

1   A.   So fuel for heavy equipment is dark red, so if you

2   were caught, I mean, that's illegal.  It's, like, farm

3   equipment.  And also, TNT kept track of all of the fuel, so

4   that would mess up the measurement of what they're using for

5   their equipment.

6       Q.   Could you fill your truck with diesel at the yard?

7   Is there a diesel filler for trucks?

8       A.   No.  Just a tank for equipment.

9       Q.   And you could pick up water at the yard?

10      A.   I would always buy it at the gas station when I

11  filled up, but we definitely had an ice machine at the yard.

12  That's one thing I couldn't remember, if we had actual water at

13  the yard, 'cause I always bought it.

14      Q.   So there was an -- there was an ice machine at the

15  yard, though?

16      A.   Correct.  Correct.

17      Q.   You don't recall whether there was a water system at

18  the yard for drinking water?

19      A.   Would have been a pallet of a case of water, but I

20  can't remember for TNT because I would specifically buy it.

21  For some reason I bought Smartwater all of the time, and I did

22  not get in trouble that year.

23      Q.   You mean you didn't get in trouble 'cause you would

24  charge TNT for water purchases?

25      A.   Correct.

1    Q.    For the truck?

2    A.    For your truck, yes.

3    Q.    Okay.  What about any cleaning supplies, did you need

4    cleaning supplies when you were on site?

5    A.    Yes.  That's also -- that's -- yeah.  I forgot about

6    that.

7    Q.    What cleaning supplies did you need?

8    A.    So when they are operating, the windows get very

9    dirty, so our main thing would be wipes and window cleaner.

10    Q.    What do you mean by wipes, just towels or paper

11    towels?

12    A.    Yes, towels, paper -- well, rags, whatever you can

13    use to clean a window with.

14    Q.    Did you usually use paper towels, or did you use

15    cloth towels?

16    A.    Cloth towels work better.  And also, microfiber

17    towels for inside the crane.

18    Q.    How often did you have to wipe down the exterior of

19    the crane?

20    A.    That'd be every hour and a half.  So there's stages -

21    - pretty much our work, it varies a little bit, but every hour

22    and a half is when we actually get into the crane and move the

23    equipment, and within that stage, that duration, you have

24    various they call it honey oil.  It's just from lifting up that

25    tall equipment, all of the oils fall on the crane, so -- and

1   also the dust and the sand from fracking.  So each time you get

2   up there, unless you're not doing your job properly, you'd have

3   to wipe it to get a clear view of vision.

4       Q.   **How often did you have to wipe down the interior of**

5   **the crane?**

6       A.   At the end of every shift you should.

7       Q.   **How often did you wipe down the interior?**

8       A.   Every shift.

9       Q.   **But not everybody does?**

10      A.   Unfortunately, no.

11      Q.   **So how often did you use some sort of cleaning**

12  **solution on the crane?**

13      A.   Every hour and a half we'll clean the window.

14      Q.   **Okay.  Did you use a solution on the inside?**

15      A.   No.  Many of our windows are tinted, so that would

16  mess it up.

17      Q.   **What cleaning solutions did you use on the outside?**

18      A.   I don't remember the exact brand, but it's just a

19  aerosol can of window cleaner.

20      Q.   **Like, Windex or something like that?**

21      A.   Yes, sir.

22      Q.   **So let's start with towels and rags.  Where did you**

23  **get the towels and rags and microfiber cloth that you used to**

24  **wipe the crane?**

25      A.   I would always buy it, but also, I believe there's

1   instances where -- instances where the yard would have to buy

2   it from a hardware store.

3       **Q.    Why did you buy it instead of get it at the yard?**

4       A.    Different brands work better, different towels work

5   better, and just to get it on my own.

6       **Q.    Could you put that on your company credit card and**

7   **charge it to TNT?**

8       A.    Yes.

9       **Q.    And how long did those towels last before you had to**

10  **replace them?**

11      A.    One individual towel, say, one shift.

12      **Q.    Would you just throw it away at the end of the shift?**

13      A.    Yes.

14      **Q.    So how many towels would you buy at a time? Would you**

15  **just buy a big whole lot of 'em 'cause you were going to use**

16  **them once a shift, or did you buy 'em one at a time?**

17      A.    No.  You'd buy a large quantity, 25 rags.

18      **Q.    So would that last you 25 shifts?**

19      A.    You personally, yes.  But if you and another operator

20  are using it, it would be cut in half.  But yes, per -- per day

21  shift, night shift, two rags.

22      **Q.    So if you shared your rags, then --**

23      A.    Yes.

24      **Q.    -- obviously you go through them quicker?**

25      A.    Yes.

```
 1        A.   Say it one more time.

 2        Q.   So you would drive from your home to the yard to the

 3   jobsite?

 4        A.   Yes.

 5        Q.   You could stop between your home and the yard, or you

 6   could stop between the yard and the jobsite; right?

 7        A.   No.

 8        Q.   Okay.

 9        A.   Well, you could but --

10        Q.   But you didn't?

11        A.   -- you would go fill up to the yard, pick up your

12   rigger, and then go to work.

13        Q.   That's -- yeah.

14        A.   Yeah.

15        Q.   I think we're on the same page.

16        A.   Okay.

17        Q.   So you stopped between your home and the yard, that's

18   just what you did?

19        A.   For fuel, yes.

20        Q.   Okay.

21        A.   Yeah.  Yeah.

22        Q.   Did you talk to other guys about where they stopped?

23        A.   Again, no.  I mean, I know you have to ask, but yeah,

24   no.

25             THE REPORTER:  What was the end of that answer, Mr.
```

1  TNT customer you were working for on the job?

2      A.    No.  It'd just be just like that, if it's the first

3  or last day, but different -- different jobs, we would be

4  allowed to charge for the meeting or not allowed to charge for

5  the meeting, but it doesn't change the first day and the last

6  day traveling in and out.

7      Q.    Okay.

8      A.    I guess I was trying to be lenient, try to get

9  something but not put all of it.

10     Q.    Let's go to the Saturday and Sunday jobs.  These are

11  Cimarex jobs; right?

12     A.    Yeah.

13     Q.    And let's see.  It looks like you put down one and a

14  half hours travel for shift; right?

15     A.    Correct.

16     Q.    And here they were marked out.  Do you see that?

17     A.    Yes.

18     Q.    Do you see the note?  It says, "No travel on

19  Cimarex"?

20     A.    Mm-hmm.  Yes.

21     Q.    Okay.  You didn't make that note; right?

22     A.    No.  That's not my handwriting.

23     Q.    Okay.  And it looks like there is a JH or a J of some

24  type down here.

25     A.    Correct.

1    Q.    Okay.  So it looks like John Harrison made that mark?

2    A.    It looks like it, yes.

3    Q.    Okay.  Do you know why he made that -- that change?

4    A.    Just because it says we cannot charge for Cimarex.

5    Q.    So on any of these entries, do you -- I guess any of

6    the ones we've seen so far, have you entered in that you --

7    have you made the note that you spent time at the yard before

8    going to the jobsite?

9    A.    No.  Never.  We would have never put that.

10   Q.    Would you go by the yard if you weren't picking up a

11   rigger?

12   A.    It depends, but usually not unless you were picking

13   up something besides a rigger, like fuel and the other things

14   we talked about.

15   Q.    So it's possible but, like, less than 50 percent of

16   the time if you're not picking up a rigger, would you go by the

17   yard?

18   A.    No.  I would probably have what I need, or I would

19   get fuel from a gas station.

20   Q.    Okay.  So for, like, the coil tubing job at Conoco

21   Phillips Goldsmith --

22   A.    Yeah.

23   Q.    -- the first one that you worked on, for that one

24   most days you're probably not picking up a rigger; right?

25   A.    Well, you wouldn't have a rigger at all.  That's why

1      Q.    Okay.  So in both of these --

2      A.    -- back to the yard.

3      Q.    -- this is a taxi job where you were taking the

4  crane?

5      A.    Correct.

6      Q.    So on a taxi job you put the travel down?

7      A.    Correct.

8      Q.    Okay.  Let's look at Chevron Orla.  This is the next

9  -- page 21.  The first entry is on that Wednesday. With less

10 questions as we go along, I promise.  It'll go quicker as we

11 get through it 'cause we see the same stuff. All right.  A few

12 questions.  First, we have travel and meeting; right?  This is

13 the first entry?

14     A.    Correct.

15     Q.    And it's 3:30 to 6 p.m.  So it looks like you're

16 charging for travel there and travel back for Chevron Orla for

17 the rest of this -- this time sheet when you're going to

18 Chevron Orla; right?

19     A.    I guess.

20     Q.    Okay.  And over here on the right we have $60 per

21 diems.  Do you see that?

22     A.    Yes.

23     Q.    Do you think you were staying at a man camp this

24 week?

25     A.    Yeah.  It had to be either at a man camp or a hotel,

1   'cause I believe earlier I saw 35.

2       Q.    There was a 35 earlier, yeah.

3       A.    They must have raised it.  Yeah.  You're not staying

4   at your house.

5       Q.    For the lower -- so for the lower per diems, you're

6   not staying at your house, you're staying --

7       A.    They're providing it.

8       Q.    -- at the company-provided housing?

9       A.    Correct.

10      Q.    So why are you charging travel here?  Is it because

11  you're staying at the company-provided housing, or is it

12  because of something else?

13      A.    So we're in Orla.  It seems so.

14      Q.    It seems so what?

15      A.    That because I'm at the man camp.

16      Q.    Okay.  So you're charging travel here because you're

17  staying at the camp?

18          THE REPORTER:  I'm sorry.  Before that last question,

19  what was your answer, Mr. Sanchez?

20          THE DEPONENT:  I said it seems so because it seems I

21  am staying at a company-provided location.

22  BY MR. BULLER:

23      Q.    So it seems like you're charging for travel because

24  you're staying at the man camp or the company housing?

25      A.    Correct.

```
 1       Q.    Let's keep going to page 22.  It looks like this week

 2  is working back in Midland; right?

 3       A.    Yes.

 4       Q.    We have $100 per diems on the right, which means

 5  you're going back to your Midland apartment; right?

 6       A.    Correct.

 7       Q.    And we're not charging for travel; right?

 8       A.    Correct.

 9       Q.    Going to page 23 is the same.  Page 24, let's take a

10  look here.  So the first day appears to be the back half of a

11  shift on Monday of Chevron Midland; is that correct?

12       A.    Monday?

13       Q.    Yeah.

14       A.    Yeah.

15       Q.    Monday here the first entry is Chevron Midland.

16       A.    Yes.

17       Q.    Okay.  And then it looks like the next entry starting

18  at 4 p.m., a night shift at Chevron Pecos; right?

19       A.    Yes.

20       Q.    This has rig up plus travel; right?

21       A.    Correct.

22       Q.    And then if we go to the end of that shift on Tuesday

23  morning, it has, "Debrief and travel."  Correct?

24       A.    Correct.

25       Q.    So it looks like for the Chevron Pecos job that you
```

```
 1                         CERTIFICATE

 2

 3        I, Mark Higgs, do hereby certify that I reported all

        proceedings adduced in the foregoing matter and that the
 4
        foregoing transcript pages constitutes a full, true and
 5
        accurate record of said proceedings to the best of my
 6
        ability.

 7        I further certify that I am neither related to

        counsel or any party to the proceedings nor have any
 8
        interest in the outcome of the proceedings.
 9
          IN WITNESS HEREOF, I have hereunto set my hand this
10
        21st day of October, 2022.
11

12

13

14        _____

15                         Mark Higgs

16

17

18

19

20

21

22

23

24

25
```