# Exhibit F

**ANTOY BELL  -  VOLUME 1 - July 15, 2020**

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2               MIDLAND/ODESSA DIVISION

 3   TIMOTHY W. REPASS AND       )
     WILLIAM SCOTT MCCANDLESS,   )
 4   INDIVIDUALLY AND ON         )
     BEHALF OF ALL OTHERS        )
 5   SIMILARLY SITUATED,         ) CIVIL ACTION
                                 )
 6          Plaintiffs,          ) NO. 7:18-CV-107-DC-RCG
                                 )
 7   VS.                         )
                                 )
 8   TNT CRANE AND RIGGING,      )
     INC.,                       )
 9                               )
            Defendant.           )
10

11        ------------------------------------

12              ORAL DEPOSITION OF

13                 ANTOY BELL

14       AS DESIGNATED REPRESENTATIVE OF

15          TNT CRANE & RIGGING, INC.

16                July 15, 2020

17                 Volume 1

18        ------------------------------------

19       ORAL DEPOSITION OF ANTOY BELL, Volume 1, produced

20   as a witness at the instance of the Plaintiffs, and duly

21   sworn, was taken in the above-styled and numbered cause

22   on the 15th of July, 2020, from 10:03 a.m. to 2:58 p.m.,

23   before Julie A. Jordan, CSR, RPR, in and for the

24   State of Texas, reported by machine shorthand via Zoom,

25   at the offices of TNT Crane & Rigging, Inc., 925 South
```

**ANTOY BELL  -  VOLUME 1 - July 15, 2020**

1    Loop West, Houston, Texas 77054, pursuant to the Federal

2    Rules of Civil Procedure and any provisions stated on

3    the record or attached hereto.

4                        *-*-*-*-*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  going to assume that you both heard and understand the

2  question.  Okay?

3      A.    Okay.

4      Q.    I'm not trying to make this a marathon

5  session, so if you need a break at any time feel free to

6  ask for one.  The only thing that I would ask you to do

7  is answer any question that's on the table before we

8  break.

9              Is that acceptable?

10     A.    That's fine.

11     Q.    Okay.  And we're taking this deposition

12  pursuant to Rule 30(b)(6), and so there's some weirdness

13  in the meaning of "you" I found in these depositions.

14              Unless I indicate otherwise, when I say

15  "you" during this deposition, I'm referring to TNT as

16  the witness here today.

17              Is that acceptable?

18     A.    Yes, sir.

19     Q.    My understanding is you're a lawyer, is that

20  right, Mr. Bell?

21     A.    That is correct.

22     Q.    Are you licensed to practice in the state of

23  Texas?

24     A.    I am.

25     Q.    How long have you been licensed?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1        A.    Since 2005.

2        Q.    And what year did you graduate law school?

3        A.    2004.

4        Q.    And where did you go to law school?

5        A.    The University of Iowa.

6        Q.    And where did you go to college?

7        A.    Morehouse College.

8        Q.    And what year did you graduate from Morehouse?

9        A.    1996 -- I'm sorry, 2000.

10       Q.    So you started in 1996 and graduated in 2000,

11  is that right?

12       A.    That is correct.

13       Q.    By the way, one thing we didn't talk about is,

14  if you -- if I ask you a question, please try to give me

15  a verbal response.  It's hard for the court reporter to

16  take down a shake of the head.

17              Have you ever -- well, let me ask a

18  different question.

19              By whom are you currently employed?

20       A.    TNT Crane and Rigging, Inc.

21       Q.    And you are its general counsel currently, is

22  that true?

23       A.    No, sir.

24       Q.    What is your position?

25       A.    Director of human resources.

ANTOY BELL   -   VOLUME 1 - July 15, 2020

 1        A.    Yes.

 2        Q.    And when was that?

 3        A.    That was prior to the issuance of these memos.

 4        Q.    So the same time you advised it about the

 5   preparatory concluding work, you advised it about travel

 6   time.  Is that true?

 7        A.    That was one of the times, yes.

 8        Q.    And what did you tell TNT insofar as the

 9   legality of what it proposed to do was concerned?

10              MR. JODON:  I want to object to the form

11   of the question.  I think it's vague with respect to

12   the -- you know, the particular issue of travel that

13   you're talking about.

14              MR. MORELAND:  Okay.  I'll rephrase.

15   That's fair.

16        Q.    (BY MR. MORELAND)  What is it that you told

17   TNT about whether or not it was obligated to pay travel

18   time?

19        A.    I told TNT when obligations to pay travel took

20   place.

21        Q.    And what specifically did you tell them in

22   that regard?

23        A.    We -- we spoke of when traveling from the

24   branch location to a job site and when traveling from

25   location to location.

ANTOY BELL - VOLUME 1 - July 15, 2020

1      Q.   And what did you tell them about the travel
2 from branch to job site?
3      A.   I told them when -- when an employee leaves
4 the branch and travels to a job site, that we must pay
5 for that time.
6      Q.   Were there any exceptions to that rule that
7 you conveyed to the company?
8      A.   No, I don't recall there being any exceptions.
9      Q.   And who specifically at the company did you
10 advise this?
11      A.   There was more than one person.  Particularly
12 I remember speaking with Houston branch manager and at
13 the time San Antonio branch manager Gary Harvey.
14      Q.   Was this before or after Mr. Harrison began
15 working at TNT?
16      A.   This would have been during the time he was
17 working at TNT.
18      Q.   Did you tell him or convey this advice to him
19 as well?
20      A.   Yes, I have conveyed this advice to him.
21      Q.   On how many occasions?
22      A.   I don't recall.
23      Q.   And you conveyed this advice to him before
24 Mr. Repass filed this lawsuit, is that true?
25      A.   That is true.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1      Q.   And I assume that with respect to the travel
2  from location to location you gave them the same advice
3  that the company should pay for it, is that right?
4      A.   Yes.
5      Q.   And did you give that same advice to the same
6  people?
7      A.   To the same three people that I spoke about?
8      Q.   Yes, sir.
9      A.   Yes.
10     Q.   I just want to make sure the record is clear
11  on this.
12          So before this lawsuit was filed -- well,
13  let me start over.
14          Did you give this advice starting in, say,
15  2015?
16     A.   I couldn't tell you the exact year.  It could
17  have been prior to that as well.
18     Q.   Did you convey this advice in connection with
19  discussions about the drive time memos we've touched on
20  today?
21     A.   That was one time that I did, yes.
22     Q.   On what other occasions did you give this
23  advice?
24     A.   I spoke with the branch manager in
25  Ratliff City, Oklahoma, about travel time.

1      Q.    Let me just limit it to branch managers in

2  Texas just to make it a little easier on everybody.

3  Okay?

4                   On what other occasions did you convey

5  this advice to branch managers in the state of Texas?

6      A.    As I reference, I don't recall every single

7  time what date that was going on.  So I spoke with a

8  branch manager in Beaumont on the same topic as well.

9      Q.    So for now, we know that prior to the

10  institution of this lawsuit, you advised Mr. Murray in

11  Houston, Mr. Harvey in San Antonio, and Mr. Harrison in

12  Midland that you -- it was your opinion that TNT was

13  obligated to pay for the travel time from the branch to

14  the job site.  Is that true?

15      A.    That is correct.

16      Q.    And did you give TNT any advice about whether

17  or not it was obligated to pay for the travel time from

18  the job site to the branch -- back to the branch?

19      A.    I did.

20      Q.    And what was your advice in that regard?

21      A.    We went through scenarios and in scenarios I

22  advised this is when we compensate for the time from the

23  branch back -- from the job site back to the branch.

24      Q.    And what were those scenarios?

25      A.    I couldn't recall each and every scenario we

1    this advice?

2         A.    They said okay.

3         Q.    And having reviewed the documents in the case,

4    do you feel like they followed your advice?

5         A.    I do.

6         Q.    I want to talk to you a little bit about the

7    reporting relationships at TNT.

8                   Now, my understanding is there's a branch

9    manager over each branch, is that right?

10        A.    That is correct.  That is --

11        Q.    There's an operations -- go ahead.

12        A.    That is -- in general, yes.  Some branches do

13   not have a branch manager.

14        Q.    Houston, San Antonio, Midland, they had branch

15   managers, right?

16        A.    Yes.

17        Q.    And do each of those three branches also have

18   operations managers and operations supervisors?

19        A.    No.

20        Q.    Midland has an operations manager, correct?

21        A.    They did, yes.

22        Q.    Okay.  Is that position no longer in

23   existence?

24        A.    Correct.

25        Q.    Okay.  And that was occupied by Mr. Hastey, is

1    that right?

2        A.    Correct.

3        Q.    Is he still employed by TNT?

4        A.    Yes.

5        Q.    In what position?

6        A.    Sales.

7        Q.    Who did the operators report to?

8        A.    Depends on the branch.

9        Q.    Who do they report to in Midland?

10       A.    In Midland they report to the operations

11   manager.

12       Q.    Who is that now?

13       A.    So now there is no operations manager.  They

14   report directly to the branch manager.

15       Q.    Okay.  Who do the crane operators report to in

16   San Antonio?

17       A.    To the branch manager.

18       Q.    And who do they report to in Houston?

19       A.    To the operations manager.

20       Q.    And who does the operations manager report to?

21       A.    In Houston?

22       Q.    Yes, sir.

23       A.    To the branch manager.

24       Q.    And who do the branch managers report to?

25       A.    Branch managers report to -- it depends.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1      Q.   Explain that, please.

2      A.   There are times and -- and some branch

3  managers will report to a vice president.  Then there

4  are some times branch managers will report directly to

5  the president or another branch manager.

6      Q.   Who does -- did you say "or another branch

7  manager"?

8      A.   Correct.

9      Q.   Who does the Midland branch manager report to?

10     A.   The president.

11     Q.   And who does the San Antonio branch manager

12  report to?

13     A.   The president.

14     Q.   And who does the Houston branch manager report

15  to?

16     A.   The president.

17     Q.   And who is the president?

18     A.   Kregg Lundsford.

19     Q.   Did you get -- did you say Lundsford?

20     A.   Lundsford, yes, sir.

21     Q.   And did you give Mr. Lundsford the same advice

22  that you gave to the branch managers about the

23  compensability of drive time that we've discussed?

24     A.   I would have.  I don't recall off the top of

25  my head having any direct conversations with him about

1  first work of the day?

2      A.   Yes.

3      Q.   And the first work of the day could involve

4  loading tools, getting fuel, loading ice or other

5  supplies that they needed in order to perform their

6  duties as crane operators.  True?

7      A.   It could -- some of those things it could

8  start the day, yes.

9      Q.   Which ones do you believe do not start the

10  first work -- do not constitute the first work of the

11  day?

12      A.   I think loading ice is required as a duty of

13  the crane operator.

14      Q.   Anything else?

15      A.   I'm trying to remember if -- all you said.

16  You said tools, ice.

17      Q.   The fuel or other supplies necessary to

18  perform their work.

19      A.   Yeah.  If it's necessary to perform their work

20  yes.

21      Q.   So you would agree with me that if it's

22  necessary to perform their work, the operators loading

23  that -- those items, when they do, that they're

24  performing the first work of the day, correct?

25      A.   If it's necessary to perform their work, yes.

 1  fair to conclude that dispatchers could -- well, at
 2  least sign off on time sheets for operators, right?
 3      A.   Based on this memo, yes.
 4      Q.   And what other types of authority did
 5  dispatchers have over operators?  What could dispatchers
 6  tell operators to do insofar as their work is concerned?
 7      A.   Dispatchers tell crane operators which job to
 8  go and -- and what time to be there.
 9      Q.   So dispatchers can tell crane operators when
10  to be and where to be.  Is that true?
11      A.   Yes.
12      Q.   And dispatchers can also and do direct crane
13  operators to, for example, pick up their riggers if a
14  rigger is required on a job, right?
15      A.   Sometimes.
16      Q.   Mr. Bell, I'm showing you a memo dated
17  June 15th, 2015, TNT Bates No. TNT 6166.
18           Take a moment to review it and let me know
19  when you're ready to discuss it.
20      A.   Scroll -- scroll down a little bit.  I want to
21  see the top of it.
22      Q.   There you go.  Here, let me --
23      A.   Okay.
24      Q.   -- pull it back a little bit.
25           How -- how's that?

1  operators in this case that they were specifically told

2  that?  Is that what you're saying?

3      A.   I'm saying that someone specifically told all

4  38 of those crane operators that they must put down all

5  hours worked as well as our handbook reads that if they

6  expect to be compensated for it, they should put that

7  down on their time sheet.

8      Q.   That's what you think the policy says, the

9  handbook says?

10     A.   Yes.

11     Q.   By the way, this memo is dated April 1st,

12  2018.

13          How long had this policy been in effect?

14     A.   This -- which -- which part of this policy are

15  you referring to?

16     Q.   Okay.  Fair question.

17          There -- it's my understanding -- let me

18  see if I can hurry this along.

19          It's my understanding that some version of

20  this policy has been in -- in effect since at least

21  March of 2014.  Is that right?

22     A.   Some version of this policy was in effect

23  since we started working out of Midland.

24     Q.   And when was that?

25     A.   Oh, I believe in 2012.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
 1        Q.    And this was before Mr. Harrison was employed
 2   with the company?
 3        A.    Yes.  Well I won't say employee.
 4        Q.    What was the arrangement --
 5        A.    Before he was branch manager --
 6        Q.    Sorry.
 7        A.    Okay.  I'm sorry.  I wouldn't say employee,
 8   but before he was branch manager there.
 9        Q.    The earliest version of this policy, I'll tell
10   you, is -- that I've seen is one from 2014, which is
11   there.
12               Do you see that?
13        A.    Yes, sir.
14        Q.    And are you saying there's one earlier from
15   2012?
16        A.    I'm saying that was the policy earlier.
17        Q.    And so this was the first written version of
18   this -- of this policy, is that correct?
19        A.    Yes, sir.
20        Q.    So what is the reason or reasons -- what are
21   the reasons for this policy?
22        A.    To explain the timekeeping policies -- to
23   further explain the timekeeping policies and how per
24   diem is paid.
25        Q.    Anything else?
```

1  cut off at midnight and started work the next day.

2      Q.   All right.  Do you see anything else that

3  insures compliance with the FLSA?

4      A.   If you could scroll down some.

5      Q.   (Scrolling.)

6      A.   (Reviewing document.)  Scroll a little bit

7  more for me.

8      Q.   (Scrolling.)

9      A.   (Reviewing document.)  4 here at the bottom,

10  "Safety meeting time should be documented accurately."

11      Q.   Is that all?

12      A.   1, "Lable (sic) equipment that is being

13  pre-tripped."  And that's all I see.  He's on 8450.

14      Q.   By the way, referring back to 1, TNT expected

15  its operators to pretrip their vehicles before heading

16  out into the field, right?

17      A.   Before driving a vehicle, yes.

18      Q.   All right.  I just want to -- so we've seen

19  the one from March of 2014.  I'm going to show you the

20  others just to get them on record here.

21      A.   I'm sorry about that beeping.  I can't figure

22  out how to shut that program off.

23      Q.   Oh.  That's -- I'm not going to complain about

24  you and technology in this deposition.

25              Okay.  I'm showing you 5598 through 5599.

1 And this -- 5598 is an iteration of this policy from

2 March of 2015, is that right?

3     A.   Yes.

4     Q.   And then 5599 is an iteration from

5 April of 2016, correct?

6     A.   Correct.

7     Q.   And as each of these policies came out, they

8 changed things slightly.  Is that true?

9     A.   Yes, sir.

10     Q.   And did later ones supplant earlier ones?

11     A.   Yes.

12     Q.   And was -- were these policies applicable to

13 all three of the yards at issue in this case?

14     A.   No, sir.

15     Q.   Which yards were they applicable to?

16     A.   Depended on who the policy came from, so I'd

17 have to look at each one of them to see.

18     Q.   Okay.  I'm showing you TNT 5602 through 5610.

19 Okay?  And this appears to be a series of e-mails among

20 Mr. Harvey, Mr. Harrison, and you regarding these

21 policies.

22             Do you see that?

23     A.   Yes, sir.

24     Q.   And -- so we know that you, Mr. Harvey, and

25 Mr. Harrison were involved in these -- in the creation

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1   of these -- of at least the 2018 policy.

2                 Does that help you to answer the question

3   which of the three yards at issue in this case these

4   memos applied to?

5       A.   Not all of them.  For this particular memo, it

6   helped me answer that question.

7       Q.   And how did it help you?  What's the answer to

8   the question?

9       A.   This would have been applicable to the Midland

10  yard.

11      Q.   Okay.  What about San Antonio?  Why not San

12  Antonio?

13      A.   This wouldn't have involved the San Antonio

14  yard.

15      Q.   Mr. Harvey is involved in a discussion about

16  it.

17                 He was over the San Antonio yard, correct?

18      A.   He was over the San Antonio yard, and at this

19  time he was supervising John Harrison.

20      Q.   So it's your contention that San Antonio

21  followed a different policy than Hou- -- than Midland,

22  is that right?

23      A.   Can you scroll down some?  I want to read the

24  rest of the e-mail chain back and forth.

25      Q.   (Scrolling.)

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1      A.    (Reviewing document.)  Yes, sir.

2      Q.    So I'm sorry.  Are you saying that the memo is

3  applicable to San Antonio and Midland?

4      A.    No, sir.  Only Midland.

5      Q.    Okay.  San Antonio had a similar policy

6  whereby it paid certain amounts of per diem, and if it

7  paid you a hundred dollars per diem, say, you would not

8  get drive time, right?

9      A.    I have to look at it and see.  It did have a

10  similar memo.

11      Q.    Okay.  Has that memo been produced?

12      A.    Yes.  It's one of the memos you have from

13  '15 or '14, one of those years.

14      Q.    Okay.  So when we're looking at 5599, that's a

15  April 2016 memo.

16             Was that applicable to San Antonio?

17      A.    Just looking here, I can't tell.

18      Q.    But you think the memo regarding San Antonio

19  has been produced, is that right?

20      A.    Yes, sir.

21      Q.    Is this memo regarding San Antonio 8450 --

22  TNT 8450?

23      A.    This one is, yes.

24      Q.    Okay.  And has this memo been in effect from

25  2014 until the present in San Antonio?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
1        A.    May I see the '16 memo again?

2        Q.    (Scrolling.)

3        A.    Scroll down, please.

4        Q.    There it is.

5              Do you have it there on your screen,

6   Mr. Bell?

7        A.    Yes.  I'm following you.

8              Yes.  The '14 memo is -- is one that would

9   be in effect with the possibility of some one-off e-mail

10  changing something in there.

11       Q.    And if that one-off e-mail exists, it would

12  have been produced in this case, right?

13       A.    It should -- should have been produced, yes,

14  sir.

15       Q.    Now, insofar as the 2018 memo is concerned,

16  you, Mr. Harvey, and Mr. Harrison were involved in

17  promulgating that policy.  True?

18       A.    True.

19       Q.    And, in fact, you corrected the policy at some

20  point, right?  You had input into that policy by making

21  changes to it, right?

22       A.    Yes, I had input into the policy.

23       Q.    And at this time, did you advise Mr. Harrison

24  and Mr. Harvey that TNT had to pay drive time for the

25  operators if they performed compensable work before
```

ANTOY BELL - VOLUME 1 - July 15, 2020

```
1        A.    No, sir, I don't.
2        Q.    Did anybody keep any notes about the telephone
3   call?
4        A.    No.
5        Q.    Did -- okay.
6        A.    Let me say -- let me back up.  I didn't keep
7   any notes about it.  I can't speak for what the other
8   two did.
9        Q.    Fair enough.
10              What, if anything, did TNT do to ensure
11  that each version of this drive time policy that we've
12  looked at today was lawful under the Fair Labor
13  Standards Act?
14       A.    I reviewed the policy in comparison with the
15  Fair Labor Standards Act to make sure that we were
16  following the law.
17       Q.    And what specific authority did you review
18  in -- to ensure that you were following the law?
19       A.    That would have been the actual Fair Labor
20  Standards Act.  That would have been case law checked on
21  in CLEs.
22       Q.    Anything else?
23       A.    I don't believe so.
24       Q.    Did you keep a file on your research?
25       A.    In -- in this particular case?
```

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
1        Q.    Yes, sir.

2        A.    No, I would not have kept a file on my

3  research.

4        Q.    Did you draft a memo?

5        A.    No, I wouldn't have drafted a memo.

6        Q.    Is there anything in writing about your

7  deliberations about whether or not this policy was

8  compliant with the Fair Labor Standards Act?

9        A.    I'd have to review the e-mails that we turned

10 over.  It may be some language in those e-mails where I

11 told them, Hey, this -- this looks good.  This is --

12 this is fine.

13       Q.    I'm showing you an e-mail at TNT 5602.

14             Well, do you see that there?

15       A.    Yes, sir.

16       Q.    Can you take a moment to review this and I'll

17 represent to you that I believe this was the last e-mail

18 that you sent about this particular drive time policy.

19       A.    Let me go to the top of it, see what the very

20 top says, or is it cut off?

21       Q.    (Scrolling.)

22       A.    Okay.

23       Q.    Yeah.  That's the very top of it there,

24 Mr. Bell.

25       A.    Okay.  (Reviewing document.)
```

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1      Q.   (Scrolling.)

2      A.   (Reviewing document.)  Scroll down a little

3  bit.

4      Q.   (Scrolling.)

5      A.   A little bit more.

6      Q.   (Scrolling.)

7      A.   That's the end?

8      Q.   Let's see.  This is the next page.

9      A.   Okay.  Any other pages?

10     Q.   That's 5603.

11     A.   I'm fine with that page.

12              Is there another page?

13     Q.   (Scrolling.)  This is -- I'm showing you now

14  5604.

15     A.   (Reviewing document.)  I'm fine with that

16  page.

17     Q.   5605 is the first page of an attachment.

18     A.   (Reviewing document.)  I'm fine with that

19  page.

20     Q.   Is that right?

21     A.   Yes, sir.

22     Q.   5606 is the second page.

23     A.   I'm fine with that page as well.

24     Q.   And we've already looked at 5607.

25     A.   Okay.  So this -- this e-mail would indicate

1  that this was sent to me to make sure that this was

2  compliant, and when I replied back with things

3  highlighted and the changes that I made letting them

4  know that this e-mail was good.

5      Q.   And the e-mail that you're referring to is at

6  5602 dated April 4th, 2018, at 11:38 a.m.?

7      A.   That is correct.

8      Q.   And it's your contention that that e-mail

9  constituted your opinion that this was compliant with

10  the FLSA?

11      A.   Yes, sir.

12      Q.   And this is the only writing in which you

13  express that opinion, is that right?

14      A.   I believe so.

15      Q.   Now, if I'm understanding your testimony

16  correctly, it is that in order for an operator to be

17  paid, that operator must detail the time that he or she

18  spends working in his or her time sheet, is that right?

19      A.   The operator must explain what work they've

20  done for the time they want to be paid, yes.

21      Q.   I want to go back to this April 2018 drive

22  time memo.

23           Can you explain in your own words how this

24  policy works?

25           MR. JODON:  Is there a particular aspect

1   the shorter side than the longer.

2              MR. MORELAND:  Okay.  I'll do my best.

3              MR. JODON:  Okay.

4              THE REPORTER:  Off the record.

5              (Recess from 1:00 p.m. to 1:38 p.m.)

6       Q.   (BY MR. MORELAND)  Mr. Bell, you testified a

7   little while ago before we broke that insofar as

8   insuring that the drive time memo was compliant with the

9   Fair Labor Standards Act you reviewed the statute and

10  case law interpreting the statute.

11             Do you recall that testimony?

12      A.   Yes, sir.

13      Q.   Do you remember what cases you reviewed?

14      A.   I do not remember the particular cases.

15      Q.   Now, what is the role of a rigger on a crane

16  operator's job site?

17      A.   The rigger could have several roles.  The main

18  role of the rigger is to connect whatever is being

19  lifted to the crane hook.

20      Q.   And is a rigger required on most job sites?

21      A.   Just really depends on the -- on the customer.

22      Q.   Is it required on most job sites in the oil

23  field?

24      A.   Depends on the customer.

25      Q.   Can you think of a customer that doesn't

1  require a rigger on its job sites?

2       A.   I'm not in the -- in the details.

3       Q.   Do you know who would know that better than

4  you?

5       A.   One of the branch managers would know.

6       Q.   Now, we talked earlier today about certain of

7  the supplies that the crane operator needs in order to

8  keep his crane in good working order and to be able to

9  operate the crane, fuel being one of them.

10               Do you recall that?

11       A.   Yes, sir.

12       Q.   And in addition to fuel, there's also diesel

13  exhaust fluid, lubricants, belts, filters, brake

14  cleaner, window cleaners.

15               These are all items that the crane

16  operator might require in order to keep his or her --

17  his crane in good working order so that he can perform

18  his job, right?

19       A.   Some of them, yes, sir.

20       Q.   And these items, they're maintained at each

21  branch location, is that right?

22       A.   Some of the items.

23       Q.   Is fuel maintained there?

24       A.   At some of our branches.

25       Q.   How about Midland, San Antonio, Houston?  Is

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
 1   fuel maintained there?
 2       A.   Yes.
 3       Q.   How about oil?  Does Midland, San Antonio,
 4   Houston stock those items?
 5       A.   Yes.
 6       Q.   And lubricants?
 7       A.   Yes.
 8       Q.   How about brake cleaner?
 9       A.   I'm not sure on brake cleaner.
10       Q.   How about window cleaner?
11       A.   Yes.
12       Q.   Who at each of the three yards is responsible
13   for maintaining the inventory of those items?
14       A.   For fuel, it would be the operations manager
15   for -- or branch manager.  Operation manager, branch
16   manager is the same.
17            For the brake cleaner -- or for the oil
18   or -- or window cleaner, it would be a shop manager.
19       Q.   Did you say a shop manager?
20       A.   Yes.
21       Q.   Okay.  It -- I'm not being difficult.  In
22   addition, to the -- kind of the video or the online
23   aspect of this deposition, you're also wearing a mask --
24       A.   Yeah.
25       Q.   -- and I can see your mouth.  So --
```

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1   required to be there.

2       Q.   Did the -- did TNT require the rigger and the

3   operator to meet at the yard to ride to the job site

4   together?

5       A.   That is not a blanket requirement, no.

6       Q.   Under what circumstances would TNT impose that

7   requirement?

8       A.   If they are dispatched that way.

9       Q.   And that would be up to the dispatcher to do

10  that, is that true?

11      A.   That would be up to the dispatcher to

12  communicate that.

13      Q.   Okay.  So if the dispatcher tells an operator,

14  Meet at such and such a day at such and such a time at

15  the yard in order to pick up your rigger, the operator

16  is required to do that.  Is that true?

17      A.   Yes.  The operator should follow those

18  instructions.

19      Q.   Now, TNT assigns company trucks to at least

20  most of the plaintiffs in the case, I believe, is

21  that -- is that correct?

22      A.   All right.  So depending on the branch some of

23  our operators do get company trucks.

24      Q.   And how about Midland and San Antonio?  Are

25  the operators assigned company trucks out of those two

1  San Antonio branch?

2       A.   As far as tie to --

3       Q.   About -- let me just start that over because

4  that was probably an objectionable question.

5                    MR. MORELAND:  You're welcome, Mark.

6       Q.   (BY MR. MORELAND)  Insofar as the timekeeping

7  practices is concerned, does the Houston yard follow the

8  same timekeeping practices and policies that we've

9  talked about today with respect to the San Antonio and

10 Midland yard?

11      A.   It would depend on which exact policies we're

12 referring to.  I would say some are -- some are

13 followed.  Some are not.

14      Q.   So let me give you a concrete example.  If an

15 operator out of the Houston yard does not put on his or

16 her time sheet that he's performing work in the yard

17 prior to driving to the job site, would they get paid

18 for that drive time to the job site if they don't put

19 that down?

20      A.   So if the customer is paying for drive time,

21 similarly, they will get paid for drive time.

22      Q.   And would you say that this is similar to the

23 policy that we looked at from 2018 applicable to the

24 Midland yard?

25      A.   I'd say that portion of it, that customer

1  paying, is -- is similar.

2      Q.   Is there any other way that it's -- that it's

3  similar?

4      A.   I don't want to do you like this, but I've got

5  to look at it so -- to make sure I'm not missing

6  anything.

7      Q.   Well, honestly, I'm asking because I have not

8  seen a memo about the Houston yard.  That -- that's why

9  I'm asking this question.  So if I had something to show

10 you, I would show it to you.

11           Are you aware of a memo?

12     A.   No, there is -- there is no memo.

13     Q.   So what is it you would need to look at in

14 order to compare?  You would need to --

15     A.   I need to look at the 2018 memo so I could see

16 if the practices are the same as in the memo.

17     Q.   Okay.  Are you seeing it?

18     A.   Yes.  We can start at the top.  Or is this the

19 area we'd be --

20     Q.   Well, I don't know.

21           My question to you is, reviewing this

22 memo at Bates Number 5596, how is the Houston

23 timekeeping policy similar to the Midland time keeping

24 policy?

25     A.   No. 1 is -- is similar under, "BELOW IS AN

 1   OUTLINE FOR YOU TO FOLLOW CONCERNING PAYROLL."

 2                No. 2 is similar under that same section.

 3       Q.   Okay.

 4       A.   No. 4 is similar.

 5       Q.   Let me know when you're ready for me to

 6   scroll.

 7       A.   Okay.  Yes, sir.  (Reviewing document.)

 8       Q.   Are you ready?

 9       A.   Not yet.  No. 6 is similar.

10            Now I'm ready for you to scroll.

11       Q.   (Scrolling.)

12       A.   The -- the deadline to turn in time is

13   similar, but I think the time is different.

14       Q.   Okay.

15       A.   So this -- this gets tricky to tell you which

16   parts are similar and which parts are not similar here

17   because there's not this great distinction of a hundred

18   dollars, $35, $60 per diem.

19       Q.   Well, as I understand it, in Houston and in

20   Midland at least, the company pays a $35 per diem in

21   both locations if it provides lodging, right?

22       A.   Correct.

23       Q.   And it a pays hundred dollars per diem if it

24   does not provide lodging, right?

25       A.   I said correct.  That's not exactly correct.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1   So Midland has man camps.  Houston does not have man
2   camps.  So there's another tier there.
3       Q.    Okay.
4       A.    So Houston is a -- just a different animal
5   from Midland.
6       Q.    Regardless, insofar as the policy requiring
7   operators to put down all compensable time before
8   driving is concerned, those policies are the same.  Is
9   that true?
10      A.    Oh, Houston you must put down all compensable
11  hours, that's right.
12      Q.    By the way, just so -- to be fair here, I want
13  to make sure.  Because this is a two-page memo, I want
14  to go to the second page at TNT 5597 and ask you, is the
15  Houston policy similar to this one?
16      A.    Part 1, pre-trip/post-trip is similar.
17                  Part 3 is similar.
18                  That would be it, 1 and 3.
19      Q.    Okay.  Thank you.  Getting back to the
20  company-assigned trucks for a moment, are these trucks
21  equipped or are any of these trucks equipped with GPS?
22      A.    As a general rule, no.
23      Q.    Okay.  You know what my next question is going
24  to be.
25                  What do you mean by "as a general rule"?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1        Q.    Other than that, are there any other

2   agreements surrounding the use of the company truck?

3        A.    Not that I am aware of.

4        Q.    And by the way, the commutes that the

5   operators are making in the company truck are often in

6   excess of one hour.

7               Would you agree with that?

8        A.    No, sir.

9        Q.    Why not?

10       A.    It depends on the branch.

11       Q.    So people in the branch would be better suited

12   to testify about that than you, is that right?

13       A.    No.  I can testify to it.  It just depends on

14   the branch whether that commute is going to be over an

15   hour or not.

16       Q.    Okay.  Let's take Midland.  Midland, it's

17   often the case that the commutes are over an hour,

18   right?

19       A.    I would say, yes, greater than 50 percent of

20   the time the commute's over an hour in Midland.

21       Q.    And how about San Antonio?  How often is the

22   commute over an hour?

23       A.    That I would say is -- commute over an hour is

24   probably 40, 35 percent of the time.

25       Q.    35 to 40 percent of the time the commutes are

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1  greater than an hour out of San Antonio?

2      A.   Right.

3      Q.   And how about Houston?  How often are the

4  commutes greater than an hour?

5      A.   Maybe 15 percent of the time.

6      Q.   Is there any way that you're aware of using

7  TNT's data to link up an individual operator, say the

8  plaintiffs in this case, to a truck that the company had

9  assigned them?

10     A.   Is there a way to see which truck was assigned

11 to that operator?  Is that what you're asking?

12     Q.   Yes, sir.

13     A.   Yes.

14     Q.   Can you explain how that -- how we might do

15 that?

16     A.   So TNT keeps an equipment list on the

17 corporate level, and if the information is relayed to

18 the corporate equipment manager of who gets assigned the

19 truck, it will be listed on the equipment list.  But the

20 information is not always relayed that way.

21     Q.   Who is responsible for relaying that

22 information?

23     A.   That would be the operations personnel at the

24 branch, so it would vary from branch to branch.

25     Q.   How about out of Midland?  Who's the person

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1  facilities, and I think that's the only additional thing

2  I needed to add.

3      Q.   Did TNT consult with outside counsel about

4  whether or not its drive time policies were compliant

5  with the FLSA?

6      A.   No.

7      Q.   Did TNT receive any complaints about the

8  failure to pay drive time?

9      A.

10          MR. JODON:  Objection to form, vague.

11          What do you mean by "complaints"?

12      Q.   (BY MR. MORELAND)  Did any operator ever lodge

13  any oral or written complaints about TNT not paying them

14  for travel time?

15      A.   Yes.

16      Q.   Can you tell me about those, please?

17      A.   Employees wanted to know, you know, why you

18  can get paid travel time going to a man camp site and

19  not travel time going to their own lodging.

20      Q.   Do you remember which employees registered

21  those concerns?

22      A.   I do not.

23      Q.   Are these concerns reflected in text messages

24  that TNT has produced?

25      A.   I'd have to review it.  I'm not certain.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1      Q.    Were any of these complaints in writing?

2      A.    I'd have to review the text messages to see if

3  it was that way.  Barring that, no, I do not believe so.

4      Q.    And when these complaints were -- or concerns

5  were registered with TNT, did TNT undertake a -- a

6  review of any of its compensation policies?

7      A.    That would have been shortly after the memo

8  was -- was put out, so the review would have taken place

9  prior to the -- the concern being raised.

10     Q.    And you've testified about everything you did

11 to review it back then, right?

12     A.    Yes.

13     Q.    What written administrative regulations did

14 TNT rely on in formulating its drive time policies to

15 make sure it complied with the FLSA?

16     A.    Couldn't recall.

17     Q.    Are there any orders or rulings by the

18 Department of Labor that TNT relied on to make sure that

19 its drive time policies were compliant with the FLSA?

20     A.    I wouldn't be able to tell you the exact --

21 exact ones.

22     Q.    Okay.  All of the operators in this case

23 are -- well, at least while working with TNT, were

24 working under the same job description.  Is that true?

25     A.    Yeah.  While they were operators, yes, all the

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    operators would -- would have the same general job

2    description, yes.

3        Q.    Okay.  And TNT has produced one job

4    description in this case and that applies to all of the

5    operators while they were operators, correct?

6        A.    That is correct.

7        Q.    And the operators all performed the same

8    general work, correct?

9        A.    Yes, sir.

10       Q.    And they did so all in the state of Texas,

11   correct?  Well, and New Mexico to some extent?

12       A.    I need to look at the plaintiff list again.

13   It could have been in other states as well.

14       Q.    Well, all of the -- the plaintiffs in this

15   case right now, they all worked out of either Houston,

16   San Antonio, or Midland, correct?

17       A.    Correct.

18       Q.    And all of the plaintiffs were paid by the

19   hour with the possibility of receiving a per diem,

20   correct?

21       A.    Correct.

22       Q.    And all of the crane operators were required

23   to follow the drive time policies applicable to the

24   three yards in the case that we have discussed today,

25   correct?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1        A.    No, sir.

2                 MR. MORELAND:  Can we take a quick break?

3     I am reaching the end.

4                 MR. JODON:  Sure.

5                 (Recess from 2:36 p.m. to 2:47 p.m.)

6        Q.    (BY MR. MORELAND)  Okay.  Mr. Bell, has TNT

7     been subject to any investigations for any alleged wage

8     and hour violations?

9        A.    No, sir.

10       Q.    And did the riggers have vehicles assigned to

11    them by TNT if they were working at a TNT -- or the

12    Midland, San Antonio, or Houston yards?

13       A.    They would not regularly have a vehicle

14    assigned to them, no, sir.

15       Q.    Are you aware of any rigger who had a vehicle

16    assigned to him?

17       A.    Assigned to him, no, sir.

18       Q.    And what I mean by "vehicle" is a company

19    vehicle assigned by TNT.

20       A.    Correct.

21       Q.    So if the operator had a vehicle assigned and

22    a job required a rigger on site, it was up to the

23    operator to transport the rigger to the job site,

24    correct?

25       A.    Incorrect.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    Q.   What's incorrect about that?

2    A.   It's not up to -- it wasn't up to the operator

3  to transport the rigger to the job site.

4    Q.   If the dispatcher told the operator to

5  transport the rigger to the job site, then it became

6  incumbent on the operator to do that.  Is that true?

7    A.   Yes, sir.

8    Q.   But you have -- without getting into the

9  substance of the documents, y'all have produced some

10  price lists and some MSAs and some other similar

11  documents concerning whether or not certain customers of

12  yours paid drive time, overtime and per diem.

13         Do you remember that -- those documents?

14    A.   Yes, sir.

15    Q.   It's fair to say that certain customers pay

16  drive time, overtime, and per diem and others don't.  Is

17  that right?

18    A.   Yes, sir.

19    Q.   And the documents that you have produced in

20  this case, do those documents accurately reflect which

21  customers paid overtime, drive time, and per diem?

22    A.   The documents that we produced are accurate,

23  yes, sir.

24    Q.   And do those documents accurately reflect all

25  of the customers who paid overtime, drive time, and per

ANTOY BELL  -  VOLUME 1 - July 15, 2020

| | | | |
|---|---|---|---|
| 1 | CHANGES AND SIGNATURE | | |
| 2 | WITNESS NAME: ANTOY BELL | | |
| 3 | DATE OF DEPOSITION: JULY 15, 2020 | | |
| 4 | PAGE  LINE | CHANGE | REASON |
| 5 | 35      12 | "is not required" | add the word not |
| 6 | 112     12 | replace "claim" with "crane" | wrong word |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
1        I, ANTOY BELL, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5                          _____

6                          ANTOY BELL

7

8   THE STATE OF  Texas    )

9   COUNTY OF  Harris      )

10

11       Before me,  Ashton Garza          , on this day

12  personally appeared ANTOY BELL, known to me (or proved

13  to me under oath or through  Known to me           )

14  (description of identity card or other document)) to be

15  the person whose name is subscribed to the foregoing

16  instrument and acknowledged to me that they executed the

17  same for the purposes and consideration therein

18  expressed.

19       Given under my hand and seal of office this

20   22    day of  December              ,  2020   .

21

22                          _____

23                          NOTARY PUBLIC IN AND FOR

24                          THE STATE OF  Texas

25                          COMMISSION EXPIRES: 6/11/22
```

ASHTON GARZA
Notary Public, State of Texas
Comm. Expires 06-11-2022
Notary ID 129842768

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                  MIDLAND/ODESSA DIVISION

3   TIMOTHY W. REPASS AND        )
    WILLIAM SCOTT MCCANDLESS,     )
4   INDIVIDUALLY AND ON          )
    BEHALF OF ALL OTHERS         )
5   SIMILARLY SITUATED,          ) CIVIL ACTION
                                 )
6           Plaintiffs,          ) NO. 7:18-CV-107-DC-RCG
                                 )
7   VS.                          )
                                 )
8   TNT CRANE AND RIGGING,       )
    INC.,                        )
9                                )
            Defendant.           )
10
```

**Amended**
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
ANTOY BELL
July 15, 2020
Volume 1
(REPORTED REMOTELY)

        I, Julie A. Jordan, Certified Shorthand Reporter in

and for the State of Texas, hereby certify to the

following:

        That the witness, ANTOY BELL, was duly sworn by the

officer and that the transcript of the oral deposition

is a true record of the testimony given by the witness;

        That the original deposition was delivered to

Mr. Edmond S. Moreland, Jr.;

        That a copy of this certificate was served on all

parties and/or the witness shown herein on  7/27/2020  .

        That the amount of time used by each party at the

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1  deposition is as follows:

2       EDMOND S. MORELAND, JR. - 04 HOUR(S):00 MINUTE(S)
        G. MARK JODON - NONE
3

4       I further certify that pursuant to FRCP Rule 30 (f)

5  (1) that the signature of the deponent:

6       XXXXX was requested by the deponent or a party

7  before the completion of the deposition and that the

8  signature is to be before any notary public and returned

9  within 30 days from date of receipt of the transcript.

10  If returned, the attached Changes and Signature Pages

11  contain any changes and reasons therefore:

12       _____ was not requested by the deponent or a party

13  before the completion of the deposition.

14       I further certify that I am neither counsel for,

15  related to, nor employed by any of the parties or

16  attorneys in the action in which this proceeding was

17  taken, and further that I am not financially or

18  otherwise interested in the outcome of the action.

19       Certified to by me this 27th of July, 2020.

20  _____
        Julie A. Jordan, Texas CSR 3203
21      Expiration Date:  1/31/22
        Firm Registration No. 280
22      JULIE A. JORDAN & COMPANY
        7800 North MoPac Expressway
23      Suite 120
        Austin, Texas 78759
24      (512) 451-8243
        (512) 451-7583 (Fax)
25      E-MAIL:  info@jordanreporting.com

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
 1  COUNTY OF TRAVIS )

 2  STATE OF TEXAS   )

 3

 4     I hereby certify that the witness was notified on

 5  ____7/27/2020_____ that the witness has 30 days

 6  (or _____ days per agreement of counsel) after being

 7  notified by the officer that the transcript is available

 8  for review by the witness and if there are changes in

 9  the form or substance to be made, then the witness shall

10  sign a statement reciting such changes and the reasons

11  given by the witness for making them;

12     That the witness' signature [was] xxxxxxx returned as

13  of ____12/22/2020_____ .

14     Subscribed and sworn to on this _22nd_ day of

15  _December___ , 2020.

16

17

18                    Julie A. Jordan

19                    Julie A. Jordan, Texas CSR 3203
                      Expiration Date:  1/31/22
                      Firm Registration No. 280
20                    JULIE A. JORDAN & COMPANY
                      7800 North MoPac Expressway
21                    Suite 120
                      Austin, Texas 78759
22                    (512) 451-8243
                      (512) 451-7583 (Fax)
23                    E-MAIL:  info@jordanreporting.com

24

25
```