**Exhibit H**

CAROL LYNELLE HARRISON - August 18, 2020

```
1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                MIDLAND/ODESSA DIVISION

3    TIMOTHY W. REPASS AND      )
     WILLIAM SCOTT MCCANDLESS,  )
4    INDIVIDUALLY AND ON        )
     BEHALF OF ALL OTHERS       )
5    SIMILARLY SITUATED,        ) CIVIL ACTION
                                )
6            Plaintiffs,        ) NO. 7:18-CV-107-DC-RCG
                                )
7    VS.                        )
                                )
8    TNT CRANE AND RIGGING,     )
     INC.,                      )
9                               )
             Defendant.         )
10

11

12         ------------------------------------

13              ORAL DEPOSITION OF

14            CAROL LYNELLE HARRISON

15               August 18, 2020

16                  Volume 1

17         ------------------------------------

18

19

20      ORAL DEPOSITION OF CAROL LYNELLE HARRISON,

21   Volume 1, produced as a witness at the instance of the

22   Plaintiffs, and duly sworn, was taken in the

23   above-styled and numbered cause on the 18th of August,

24   2020, from 9:58 a.m. to 11:30 a.m., before

25   Julie A. Jordan, CSR, RPR, in and for the State of
```

**CAROL LYNELLE HARRISON - August 18, 2020**

1   Texas, reported by machine shorthand via Zoom, at the

2   offices of TNT Crane & Rigging, Inc., 9112 West County

3   Road 127, Midland, Texas 79706, pursuant to the Federal

4   Rules of Civil Procedure and any provisions stated on

5   the record or attached hereto.

6                           *-*-*-*-*-*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAROL LYNELLE HARRISON - August 18, 2020

1  TNT's policies.  I would basically put, you know, a
2  question mark or a note by them and all time sheets
3  would go to my manager for review and he would make the
4  final decision on whether hours would be cut or not.
5       Q.   And that person was John Harrison -- is
6  John Harrison?
7       A.   Correct.
8       Q.   And what policies were you following in
9  removing time from time sheets?
10      A.   It is our payroll policy that comes out of our
11  Midland branch.
12      Q.   And was there a payroll policy in place when
13  you arrived in Midland in 2014?
14      A.   I believe there was.
15      Q.   Was it written?
16      A.   I can't recall if there was a written one at
17  that time.  I know -- I know the first one we had was
18  dated around 2015, I believe, but I don't recall if
19  there was a written policy before that time.
20      Q.   And did you -- when you were reviewing the
21  time sheets to present them to the branch manager, did
22  you have these policies with you or did you just know
23  them by heart?  How did that work?
24      A.   I knew most of them.  If it was something I
25  was questionable on, I would discuss that with the

CAROL LYNELLE HARRISON - August 18, 2020

1    manager.

2         Q.   Can you -- let's talk about the March 2015

3    policy for right now.

4         A.   Okay.

5         Q.   What is your understanding of what that policy

6    says?

7         A.   It was the policy about payroll hours, how to

8    turn in your time, how to list it out on your time

9    sheet.  There were per diem options listed.  There were

10   the post-trip -- sorry, the post-trip inspection

11   policies.

12        Q.   And TNT expected its operators to do pre and

13   post-trip inspections on their vehicles, correct?

14        A.   On equipment like haul trucks and cranes, not

15   pickup trucks.

16        Q.   Under what circumstances under the March 2015

17   policy were crane operators paid for travel time?

18        A.   They were paid for travel time if they were

19   crew travel from their lodging to the job site.  If they

20   were providing their own lodging and getting a hundred

21   dollars per diem, they were not paid crew travel to and

22   from the job site -- from their lodging to the job site.

23             If they were staying in TNT-paid lodging,

24   if they were staying in man camps or hotels where TNT

25   was paying for their lodging, therefore they were

CAROL LYNELLE HARRISON - August 18, 2020

1  receiving 35 per diem, they would get their travel time
2  from the -- their place of lodging to location.
3              And in some circumstances the customer
4  would pay for the travel time.  They would -- we were
5  able to charge a certain ability of travel time to our
6  customers.  We would pass that along to the employees
7  that were providing their own lodging.
8      Q.   Were there any other considerations that went
9  into whether or not an operator was paid for travel
10 time?
11     A.   That was it per our policies.
12     Q.   You used this phrase just a moment ago, "crew
13 travel."
14              Can -- you remember that?
15     A.   Yeah.
16     Q.   Can you explain that phrase to me, please?
17     A.   It's the same as travel time, basically.  It's
18 crew travel.  I -- I define that as travel from an
19 employee's place of lodging to the location.  That
20 would -- that is what I would say crew travel would be.
21              It's basically the same as travel time.  I
22 really wouldn't say it would be any different, but...
23     Q.   I ask about it because I've not seen -- oh,
24 I'm sorry.
25     A.   Sorry.

CAROL LYNELLE HARRISON - August 18, 2020

1    Q.    I'm sorry.

2    A.    My fault as well.

3    Q.    I think I stepped on your answer there and I

4 think I couldn't hear the last part of what you said.

5              Can you do that again, please?

6    A.    Sure.  I was just saying that I would say the

7 terms are basically the same.  I mean, it's just another

8 term that I use, crew travel and travel time.

9    Q.    I haven't seen that particular phrase in a

10 policy.

11             Does that come from a policy that you're

12 aware of?

13   A.    No.  That's kind of how we -- I don't -- it's

14 just a term that's basically the same.

15   Q.    Okay.  And when you were -- or when you were

16 annotating the time sheets and giving them to the branch

17 manager for review, before April of 2018, you were

18 following that 2015 policy, is that true?

19   A.    Correct.

20   Q.    And then let's move to the April of 2018

21 policy.

22             Do you know what I'm talking about?

23   A.    Yes.

24   Q.    First of all, do you know why there was a

25 change in policy in April of 2018?

**CAROL LYNELLE HARRISON - August 18, 2020**

1    A.   I don't know the reasons for it.  I'm not

2  involved with that process.  That comes from upper

3  management, but I know that -- I believe there was

4  some -- some items taken out to do with per diem, and I

5  can't recall specifically what -- everything that was

6  changed in that memo, but, yeah, that comes from our

7  upper management, so I wouldn't know exactly why.

8    Q.   Who do you mean by "upper management"?

9    A.   Like John Harrison, our branch manager, and I

10  believe at the time it was Gary Harvey was his boss as

11  well.  He was our regional manager, I believe he was

12  called at the time.

13    Q.   And what is your understanding of -- well, let

14  me start over.

15             Under what circumstances would a crane

16  operator be paid for travel time under the April 2018

17  policy?

18    A.   It was basically the same as before.  I don't

19  believe there were any changes made with that.

20    Q.   So just so I'm clear on your testimony, are

21  you saying that the April 2018 policy, insofar as travel

22  time was concerned, was the same as the March 2015

23  policy?

24    A.   Yes.

25    Q.   And you also followed that April 2018 policy

1  on travel time when annotating time sheets to elevate

2  them to the branch manager, is that true?

3       A.   Correct.

4       Q.   And prior to March of 2015 -- I'm sorry to

5  jump around on you like this --

6       A.   Okay.

7       Q.   -- but just want to get my timeline filled in.

8            Prior to March of 2015, did you all follow

9  the same policy insofar as travel time is concerned

10 payable to crane operators prior to March of 2015?

11      A.   I believe it was about the same.  I mean, I --

12 yeah, it should have been the same.  Yeah.

13      Q.   So is it fair to say that when you were

14 removing or annotating time -- or questioning time on

15 time sheets of crane operators, their criteria that you

16 used are the policies as you just articulated them here

17 today in this deposition?

18      A.   Correct.

19      Q.   Did you receive any training on when to

20 question travel time of crane operators?

21      A.   Yes.  Yes, I did.

22      Q.   Can you tell us about that, please?

23      A.   It would have just been going over the payroll

24 memos and just pretty much on-the-job training, as you

25 would say, and going through the time sheets, just

CAROL LYNELLE HARRISON - August 18, 2020

1  questioning anything I would think that wouldn't follow
2  the policies.
3      Q.   Was there any particular person or persons in
4  TNT who provided that training to you?
5      A.   No.
6      Q.   And so as I understand it, your training
7  consisted of reviewing the memos that we've talked
8  about, the March 2015 and the April 2018 memo, and just
9  applying the policies to actual time sheets.
10              Is that a fair summation?
11     A.   Correct.
12     Q.   Did anyone at TNT ever tell you, I don't think
13  you're doing that right or anything to that effect?
14     A.   No.
15     Q.   How was this 20- -- well, how was the March
16  2015 policy communicated to you?
17     A.   I was given the policy probably by e-mail.  I
18  was probably given a copy as well.  And we reviewed it,
19  kind of went over it and...
20     Q.   Who is "we"?  When you say "we reviewed it,"
21  who do you mean?
22     A.   It would have been sent out by our regional
23  manager.  I don't recall at the time.  John Harrison
24  probably sent it out as well.
25     Q.   When you say it would have been sent out by a

CAROL LYNELLE HARRISON - August 18, 2020

1  understood.  There's not -- I mean, I don't -- didn't

2  have a problem understanding that.

3       Q.   And does -- to your understanding, does

4  everyone who reviews time sheets at TNT share your

5  understanding of that phrase?

6       A.   Yes.

7       Q.   I'm going to show you one other memo.

8            Do you see a memo there on your screen,

9  Mrs. Harrison?

10      A.   Yes, I do.

11      Q.   Okay.  I'm going to blow it up so you can

12  actually see it.

13      A.   Okay.

14      Q.   And I'm showing you -- this is TNT 8450.  And

15  this is a memo from March 25th, 2014.

16      A.   Uh-huh.

17      Q.   And it's a similar payroll memo to the

18  March 2015 and April 2018 memo we've been talking about.

19           Did you follow this payroll policy while

20  you were in -- after you transferred to Midland?

21      A.   No.  This is our San Antonio branch.

22      Q.   Was the Midland policy similar to this one,

23  whether or not it was written?

24      A.   It was similar.  I think it was based on this,

25  but it wasn't exactly the same.  This is just for our

CAROL LYNELLE HARRISON - August 18, 2020

1  San Antonio branch.

2      Q.   So when you say "it was based on this," what

3  you're saying is the Midland policy that you all

4  followed starting in 2014 when you transferred there was

5  similar to this San Antonio policy dated March 2014.  Is

6  that true?

7      A.   Correct.  I mean, it --

8      Q.   Can you --

9      A.   Those outlined is the same, it appears to me.

10  I mean, I -- I haven't ever seen this memo before,

11  before we started this whole thing.  But from looking at

12  it, it looks like it's -- you know, basically looks the

13  same as our memo.  So that's why I'm saying it's based

14  off of that.

15      Q.   What I want to do is scroll through it for you

16  so you can look at the whole thing.

17      A.   Okay.

18      Q.   So take a moment to review what's up on the

19  screen and let me know when you're ready for me to

20  scroll.

21      A.   Okay.  (Reviewing document.)  Okay.  I'm

22  ready.  (Reviewing document.)  Okay.

23      Q.   So my question for you is, how did the Midland

24  policy that you applied prior to March of 2015 differ

25  from the memo that you just reviewed at TNT 8450?

CAROL LYNELLE HARRISON - August 18, 2020

1      Q.    I want to show you a few time sheets and just
2  ask you a few questions about them.  Okay?
3      A.    Okay.
4      Q.    I'm showing you TNT Crane 11, a document
5  produced in this case.  And this is a time sheet for Tim
6  Repass for the week ending December 31, 2017, is that
7  correct?
8      A.    Correct.
9      Q.    And first of all, the blue sticky note, is
10  that your handwriting on that sticky note?
11     A.    Yes.
12     Q.    And the "NO TRAVEL" that's above the blue
13  sticky note whose handwriting is that?
14     A.    That is mine.
15     Q.    And first of all, what did you mean when you
16  wrote "NO TRAVEL" on this time sheet?
17     A.    I meant that there is no travel to and from
18  his lodging to the job site billable.  It's not billable
19  to the customer on this.
20     Q.    And since it's not billable to the customer,
21  he's not going to be paid for it, is that true?
22     A.    Correct.
23     Q.    And then the blue sticky that we've been
24  talking about says "Cut travel to/from location on
25  Rosetta coil job."

33

CAROL LYNELLE HARRISON - August 18, 2020

1      A.    I would have access to them, yes, whether in

2  my computer or a printout.

3      Q.    And you would review them when you had

4  questions about certain time that an operator had put

5  down on his time sheet, is that true?

6      A.    Yes.

7      Q.    And on this time sheet for -- if you look in

8  the middle on Thursday, Friday, Saturday, it looks like

9  somebody marked through the "Drive Back in."

10             Do you see that?

11      A.    Yes.

12      Q.    Who marked through that time?

13      A.    That would have been me.

14      Q.    So was it your practice to mark through time

15  on the time sheet and then take it to Mr. Harrison for

16  approval?

17      A.    Yes.

18      Q.    Under what circumstances would he not adopt or

19  approve your mark-outs on time sheets?

20      A.    If it was something I made a mistake on or if

21  it was something I -- that did follow our policy that,

22  like I said, I made a mistake on.  But this certain

23  circumstance that you're showing me here, it went

24  against our policy.

25      Q.    Just to be clear, this is the policies that we

CAROL LYNELLE HARRISON - August 18, 2020

1  talked about earlier today, correct?

2     A.    Correct.

3     Q.    And when you marked out the time on these

4  three days for the drive back in, did you consult with

5  Mr. Repass about those mark-outs?

6     A.    That would go to either our -- John Harrison,

7  our manager, or our operations manager to consult with

8  them about that.  And I don't recall on this specific

9  circumstance if he was.  I assume that he was.

10    Q.    Why do you assume that he was?

11    A.    Because that's kind of our practice.  I mean,

12 if it was something that was going wrong, I mean, we

13 would discuss that with the employee.

14    Q.    Did you ever have any such discussions with

15 crane operators?

16    A.    I would have, yes.

17    Q.    Who did you have those discussions with?

18    A.    I don't recall any specific discussions.  I

19 mean, there probably -- I don't recall any specific

20 ones.  Sorry.

21    Q.    When you marked out those times we've been

22 talking about on TNT 11, did you ever ask Mr. Repass if

23 he had worked after he drove back in?

24    A.    No.  No.

25    Q.    Did you ever ask him if he had done any work

CAROL LYNELLE HARRISON - August 18, 2020

1    A.    Yes.

2    Q.    So the process was you would do an initial

3 review following the policies we've been talking about,

4 either approve all the time or mark out some of the

5 time, elevate them to Mr. Harrison.

6          He would then either approve your

7 approvals or disapprovals and then send them back to you

8 and then you would send them to corporate.  Is that

9 correct?

10   A.    Yes.

11   Q.    And in that second sticky note that we've been

12 talking about in your handwriting, it is -- it says,

13 "Getting $100 - removing travel from Thursday."

14          Did I read that currently?

15   A.    Yes.

16   Q.    And the hundred dollars refers to a hundred

17 dollars per diem, correct?

18   A.    Correct.

19   Q.    And you removed travel from Thursday or you --

20 more accurately, you suggested to Mr. Harrison to remove

21 travel from Thursday because he was getting a hundred

22 dollar per diem, correct?

23   A.    Correct.

24   Q.    And that you followed that same policy.  If

25 somebody was getting a hundred dollars per diem, they

CAROL LYNELLE HARRISON - August 18, 2020

1    times.   I would assume -- I would assume that -- that by
2    now he should know this.
3         Q.   And then the next part your sticky note you
4    write, "45 minutes each way."
5                   Did I read that correctly?
6         A.   Correct.
7         Q.   What does that mean?
8         A.   That means what was billable to the customer,
9    45 minutes travel from his lodging to the job site each
10   way.
11        Q.   And did you know where he was lodging at this
12   time?
13        A.   He was getting a hundred dollars per diem, so
14   he's providing his own lodging.
15        Q.   So you don't know, is that true?
16        A.   I don't know where he's staying, but he's
17   providing his own lodging.
18        Q.   And then you write, "I cut excess travel."
19   And I assume what you mean by that is you cut anything
20   more than 45 minutes each way because the customer was
21   not agreeing to pay for more than that, is that true?
22        A.   That is true.  45 minutes was the travel that
23   we could bill to the customer, which would have been the
24   travel to the closest place of lodging from the job
25   site.

CAROL LYNELLE HARRISON - August 18, 2020

1    Q.   Now I'm showing you TNT 2315, which is a time

2    sheet for James Perham for the week ending April 1st,

3    2018.  Is that true?

4    A.   Correct.

5    Q.   And if you look -- oh, by the way, first of

6    all, the annotation handwriting "No extra travel" on the

7    left side of that document, is that your handwriting?

8    A.   Yes.

9    Q.   And Monday -- or Thursday, Friday, Saturday,

10   Sunday his travel time is reduced from 2:30 a.m. to

11   5:00 a.m. to 4:00 a.m. to 5:00 a.m.  Is that true?

12   A.   Yes.

13   Q.   And is that because the customer only paid for

14   one hour of travel time --

15   A.   That is --

16   Q.   -- each way?

17   A.   That is correct.

18   Q.   And then he writes in his time sheet that he

19   picked up rigger Eric Flores in Odessa and drive to

20   Chevron MDC-224573.

21        Did I read that correctly?

22   A.   Yes.

23   Q.   So when you cut his time here, you knew he had

24   picked up Mr. Flores, is that true?

25   A.   Mr. Flores at his place of lodging on the way

CAROL LYNELLE HARRISON - August 18, 2020

1  to the job site, yes.

2      Q.   Do you know where Mr. Perham was lodging when

3  you cut his time?

4      A.   I do not.  He was providing his own lodging.

5      Q.   Oh, and when he's driving to Carlsbad -- well,

6  he's driving to a Chevron job in Carlsbad it looks like.

7           Is that -- is that your understanding?

8      A.   Yes.

9      Q.   And he's charged from 2:30 to 5:00 a.m.

10          Do you see that?

11     A.   Yes.

12     Q.   Is it a two-and-a-half-hour drive from Odessa

13  to Carlsbad?

14     A.   I would say that's about accurate.

15     Q.   How far is -- or how long does it take to get

16  from Midland to Carlsbad?

17     A.   Around the same.

18     Q.   Mrs. Harrison, I'm showing you the document

19  TNT 2771.

20          Do you see that there on your screen?

21     A.   Yes.

22     Q.   And there's an annotation in the middle, "No

23  extra travel per John, billable only."

24          Is that your handwriting?

25     A.   It is.

JULIE A. JORDAN & COMPANY
PHONE (512) 451-8243    FAX (512) 451-7583

CAROL LYNELLE HARRISON - August 18, 2020

1  "sure try it."  Is that true?

2        A.    Yes.

3        Q.    Do you know what happened insofar as whether

4  or not Sable would pay for Mr. Raybion's two hours of

5  travel?

6        A.    I do not recall what happened.  I'm assuming

7  that they did, but I don't recall specifically.

8        Q.    You never heard any more about it after

9  Mr. Harrison wrote "sure try it"?

10       A.    Oh, I'm sure we did.  I don't recall what the

11  answer would have been, though.

12       Q.    And I'm showing you TNT 4635, which is a time

13  sheet for Julio Castillo for the week ending

14  November 12th, 2017.

15              Do you see that?

16       A.    Yes.

17       Q.    Are those your mark-outs for travel on

18  Wednesday, Thursday, Friday, Saturday, and Sunday?

19       A.    Yes.

20       Q.    Why did you mark out that time?

21       A.    It appears that there was no billable travel

22  to this customer.  This employee was providing his own

23  lodging, so he would not qualify to receive travel from

24  his lodging to the location -- to the job site, I mean.

25  Excuse me.

49

CAROL LYNELLE HARRISON - August 18, 2020

1    Q.    And again, you made that decision according to

2 the policies from March of 20- -- the March 2015 policy

3 that we discussed early on in this deposition today, is

4 that true?

5    A.    That's correct.

6    Q.    In reviewing the time sheets that you reviewed

7 in preparation for today's deposition, some of which I

8 may have shown you today, some of which I may not have,

9 did you ever see any annotation that you wrote or that

10 Mr. Harrison wrote on any of those documents to the

11 effect that the operator was having his travel time cut

12 because he did not put down that he was working in the

13 yard or at a service station on the way to or on the way

14 back from a job?

15    A.    No, I didn't see anything like that.

16    Q.    Did anyone -- well, let me -- did any operator

17 ever complain to you directly about not being paid for

18 his travel time?

19    A.    I'm -- I'm sure there was.  I don't recall

20 specifically any employees, but I'm sure there was.

21    Q.    Are you saying that there were, but you just

22 can't recall who they were at this time?

23    A.    Right.

24    Q.    Did you ever receive any written complaints

25 about an operator not being paid his travel time?

CAROL LYNELLE HARRISON - August 18, 2020

| | |
|---|---|
| 1 | CHANGES AND SIGNATURE |
| 2 | WITNESS NAME: CAROL LYNELLE HARRISON |
| 3 | DATE OF DEPOSITION: AUGUST 18, 2020 |

| PAGE LINE | CHANGE | REASON |
|---|---|---|
| 19 : 5 | "ability" to "amount" | Misspoke or misheard this word. |
| 41 : 5 | "as watching" to "at his lodging" | Phrase was misheard and recorded incorrectly. |

CAROL LYNELLE HARRISON - August 18, 2020

1          I, CAROL LYNELLE HARRISON, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5

6                              CAROL LYNELLE HARRISON

7

8     THE STATE OF  Texas    )

9     COUNTY OF  Midland    )

10

11         Before me,  Rebekah Alt         , on this day

12    personally appeared CAROL LYNELLE HARRISON, known to me

13    (or proved to me under oath or through

14     Tx DL                ) (description of identity

15    card or other document)) to be the person whose name is

16    subscribed to the foregoing instrument and acknowledged

17    to me that they executed the same for the purposes and

18    consideration therein expressed.

19         Given under my hand and seal of office this

20     21    day of  October         ,  2020  .

21

22

23                              NOTARY PUBLIC IN AND FOR

24                              THE STATE OF  Texas

25                              COMMISSION EXPIRES: 09/28/2022

REBEKAH ALT
Notary Public, State of Texas
Comm. Expires 09-28-2022
Notary ID 131741775

CAROL LYNELLE HARRISON - August 18, 2020

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                  MIDLAND/ODESSA DIVISION

 3   TIMOTHY W. REPASS AND     )
     WILLIAM SCOTT MCCANDLESS,  )
 4   INDIVIDUALLY AND ON        )
     BEHALF OF ALL OTHERS       )
 5   SIMILARLY SITUATED,        ) CIVIL ACTION
                                )
 6         Plaintiffs,          ) NO. 7:18-CV-107-DC-RCG
                                )
 7   VS.                        )
                                )
 8   TNT CRANE AND RIGGING,     )
     INC.,                      )
 9                              )
           Defendant.          )
10
                         Amended
11              REPORTER'S CERTIFICATION
                   ORAL DEPOSITION OF
12               CAROL LYNELLE HARRISON
                   August 18, 2020
13                    Volume 1
                 (REPORTED REMOTELY)
14
```

15     I, Julie A. Jordan, Certified Shorthand Reporter in

16 and for the State of Texas, hereby certify to the

17 following:

18     That the witness, CAROL LYNELLE HARRISON, was duly

19 sworn by the officer and that the transcript of the oral

20 deposition is a true record of the testimony given by

21 the witness;

22     That the original deposition was delivered to

23 Mr. Edmond S. Moreland, Jr.;

24     That a copy of this certificate was served on all

25 parties and/or the witness shown herein on  8/25/2020 .

JULIE A. JORDAN & COMPANY
PHONE (512) 451-8243    FAX (512) 451-7583

CAROL LYNELLE HARRISON - August 18, 2020

1    That the amount of time used by each party at the

2   deposition is as follows:

3        EDMOND S. MORELAND, JR. - 01 HOUR(S):25 MINUTE(S)
         G. MARK JODON - NONE

4

5    I further certify that pursuant to FRCP Rule 30 (f)

6   (1) that the signature of the deponent:

7    XXXXX was requested by the deponent or a party

8   before the completion of the deposition and that the

9   signature is to be before any notary public and returned

10  within 30 days from date of receipt of the transcript.

11  If returned, the attached Changes and Signature Pages

12  contain any changes and reasons therefore:

13    _____ was not requested by the deponent or a party

14  before the completion of the deposition.

15    I further certify that I am neither counsel for,

16  related to, nor employed by any of the parties or

17  attorneys in the action in which this proceeding was

18  taken, and further that I am not financially or

19  otherwise interested in the outcome of the action.

20    Certified to by me this 25th of August, 2020.

21                    *Julie A. Jordan*
                Julie A. Jordan, Texas CSR 3203

22              Expiration Date:  1/31/22
                Firm Registration No. 280

23              JULIE A. JORDAN & COMPANY
                7800 North MoPac Expy, Suite 120

24              Austin, Texas 78759
                (512) 451-8243

25              (512) 451-7583 (Fax)
                E-MAIL:  info@jordanreporting.com

CAROL LYNELLE HARRISON - August 18, 2020

1  COUNTY OF TRAVIS )

2  STATE OF TEXAS   )

3

4       I hereby certify that the witness was notified on

5  ____8/25/2020_____ that the witness has 30 days

6  (or _____ days per agreement of counsel) after being

7  notified by the officer that the transcript is available

8  for review by the witness and if there are changes in

9  the form or substance to be made, then the witness shall

10 sign a statement reciting such changes and the reasons

11 given by the witness for making them;

12      That the witness' signature was xxsxxxx returned as

13 of _____12/22/2020_____ .

14      Subscribed and sworn to on this 22nd day of

15  December    , 2020.

16

17

18                    Julie A. Jordan

19                    Julie A. Jordan, Texas CSR 3203
                      Expiration Date:  1/31/22
                      Firm Registration No. 280
20                    JULIE A. JORDAN & COMPANY
                      7800 North MoPac Expressway
21                    Suite 120
                      Austin, Texas 78759
22                    (512) 451-8243
                      (512) 451-7583 (Fax)
23                    E-MAIL:  info@jordanreporting.com

24

25