# Exhibit 20

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  MIDLAND/ODESSA DIVISION

 3   RONALDO KRAMER, LAYNE        §
     MATTHEWS, JEREMY NOBLES, and §
 4   JAMES PERHAM                 §
                                  §
 5        Plaintiffs,             §
                                  §   CIVIL ACTION NO.
 6                                §   MO:22-CV-0016
     vs.                          §
 7                                §
     TNT CRANE & RIGGING, INC.,   §
 8                                §
          Defendant.             §
 9

10

11
     _____
12                     ORAL DEPOSITION
                     OF RONALDO KRAMER
13               TAKEN ON OCTOBER 4, 2022
     _____
14

15

16

17           ORAL DEPOSITION of RONALDO KRAMER, produced

18   as a witness at the instance of the Defendant, was

19   duly sworn, was taken in the above-styled and numbered

20   cause on the 4th of October, 2022, from 1:06

21   o'clock p.m. to 4:54 o'clock pa.m., before Angela Steele,

22   Shorthand Reporter, Notary, in and for the State of Texas,

23   reported by machine shorthand at, Littler Mendelson, P.C.,

24   Houston Texas, pursuant to the Federal Rules and the

25   provisions states on the record or attached hereto.
```

Ronaldo Kramer
October 04, 2022                                    5

```
 1              P R O C E E D I N G S
                **********************
 2

 3              THE COURT REPORTER:  Raise your right
 4   hand, please.  Do you solemnly swear or affirm that the
 5   testimony you are about to give in this action will be the
 6   truth, the whole truth, and nothing but the truth under
 7   the penalties of perjury?
 8              THE WITNESS:  Yes.
 9              E X A M I N A T I O N
10   BY MR. BULLER:
11      Q.  Alright, this is the deposition of Mr. Ronaldo
12   Kramer in the case of Kramer versus TNT Rigging.
13   Mr. Kramer, my name is Joe Buller, we met just a minute
14   ago.  It's nice to meet you.  Other than meeting a minute
15   ago, would you agree with me you and I have never met
16   before?
17      A.  No.
18      Q.  Alright, good.  Before we get started I want to
19   go over a few just kind of, like, I guess, sort of like
20   deposition ground rules.  Have you ever given a deposition
21   before in a case?
22      A.  I have not.
23      Q.  This is your first time.  Well, welcome.  So this
24   is just a few things to keep in mind that will help this
25   go quicker and more -- more effectively.  The first thing
```

Ronaldo Kramer
October 04, 2022                                    9

1      Q.  I was living in -- 2017, Harvey?

2      A.  I think '17.

3      Q.  Okay.

4                    THE COURT REPORTER:  Keep your voice up,

5  please.

6                    THE WITNESS:  Okay.

7      A.  I think around 2017.

8  BY MR. BULLER:

9      Q.  Okay.  And where did you live before you moved to

10  that Alvin, Texas address?

11     A.  I had a house there in Alvin.

12     Q.  Is was a different house in Alvin?

13     A.  Yes.

14     Q.  Okay.  And how long did you live at that address?

15     A.  In that house, I guess, we lived there about a

16  year.  It was with the last divorce.

17     Q.  So does something like 2016 to 2017 make sense?

18     A.  We moved in that house in 2012.  Moved in that

19  house in 2012.  2012.  And after the divorce I bought me a

20  camper.  I lived in that camper all the way up to until

21  Harvey, I lost it in Harvey.

22     Q.  Okay.  So you were in Alvin, Texas at least from

23  2012 through the present with your permanent residence.

24  Is that right?

25     A.  Yes.

Ronaldo Kramer
October 04, 2022                                           10

1        Q.  How long have you lived in Alvin?

2        A.  I moved to Alvin back in 2007.

3        Q.  What brought you to Alvin?

4        A.  I chased a woman.  I'm from Angleton.

5        Q.  And before you lived in Alvin were you living in

6   Angleton?

7        A.  Yes.

8        Q.  And that's where you grew up?

9        A.  Yes.

10       Q.  Did you go to high school in Angleton?

11       A.  I did.

12       Q.  Angleton High School?

13       A.  Angleton High School.  I played football there.

14       Q.  Did you go to any formal education after high

15   school?

16       A.  Did about a year in college.

17       Q.  Where at?

18       A.  At the Brazosport Community College.  Not too

19   long after that I got the career I am now.

20       Q.  So you didn't graduate from Brazosport Community

21   College?

22       A.  No, I got my -- I got a GED there, and then I

23   took a trade, pipe trade there.

24       Q.  Did you get a certification or some kind of

25   diploma for the pipe trade?

Ronaldo Kramer
October 04, 2022                                    13

 1      A.  I am.

 2      Q.  Congratulations.  Alright, where were you at --

 3  working before Winslow Crane?

 4      A.  I was down in Texas City with Tellepsen

 5  Industrial.

 6      Q.  What were you doing there?

 7      A.  Heavy lift crane operator.

 8      Q.  And how long were you with Tellepsen?

 9      A.  We were there five months.  About five months.

10      Q.  Alright.  And before that?

11      A.  I was with Wanzek.  I only know them as Wanzek,

12  W-a-n-z-e-k.

13      Q.  And what was your job there?

14      A.  Crane operator.

15      Q.  How long were you with Wanzek?

16      A.  It was six months there.  We finished that out.

17  That's on the wind farm stuff I did.

18      Q.  So where was this wind farm crane work?

19      A.  Brock Morton, Texas.

20      Q.  Okay.  And then before Wanzek?

21      A.  Before Wanzek...  I work for so many different

22  companies I have to look.

23      Q.  Well, let's not got to -- let's not look at a

24  document now because I can get a little more vague with

25  the questions.

Ronaldo Kramer
October 04, 2022                                                    14

1       A.   I did some turnarounds.  I did some turnarounds,

2  yeah.

3       Q.   Okay.  So let me ask it this way:  From the time

4  that you left TNT to now, have you been working as a crane

5  operator or crane operation supervisor for that whole

6  time?

7       A.   I'm either one -- one or the other capacity.

8       Q.   You mean you're either a supervisor or a crane

9  operator?

10      A.   Yes.

11      Q.   But if you're supervising are you supervising

12  crane operation?

13      A.   Um-hmm, yes.

14      Q.   So as I recall you were at TNT sometime in 2018.

15  Does the sound right?

16      A.   It was five years from this month.

17      Q.   So do you remember about how many companies you

18  worked for since you left TNT?

19      A.   There ain't enough paper here.

20      Q.   I'm assuming -- I should mentioned earlier, if I

21  ask you a question you don't know the answer to the

22  question, feel free to tell me you don't know the answer

23  the question.

24      A.   Yes, I couldn't tell you.

25      Q.   In some situations if you don't know the answer

Ronaldo Kramer
October 04, 2022                                    23

1       Q.  Who told you about the 300 mile radius?

2       A.  Management.

3       Q.  Was that during the interview process?

4       A.  Um-hmm, yes.

5       Q.  Did you ask them during the interview process

6   about whether you would be paid for your time traveling in

7   that 300 miles radius?

8       A.  I don't recall.  I don't -- I don't know if that

9   ever came up.  I don't know.

10      Q.  Have you ever worked a job as a crane operator

11  where you were paid for traveling to the job site?

12      A.  Yes.

13      Q.  Do you remember which ones?

14      A.  Like in the oil field capacity, but wind farm's a

15  little different so they paid a little different.

16      Q.  So the wind farm jobs?

17      A.  Yes.

18      Q.  Any others that you remember?

19      A.  Not that I know of.

20      Q.  So when you mentioned you didn't have a CDL, is

21  that a commercial driver's license?

22      A.  Yes.

23      Q.  So why does that mean that you would be a relief

24  operator instead of regular paid operator?

25      A.  Because the cranes are already on site, on

Ronaldo Kramer
October 04, 2022                                                    24

1    location?

2        Q.  So as a relief operator you didn't have to

3    transport the cranes?

4        A.  I did one time once a crane was taken to the

5    lease road off of the state highway, and I was able to

6    drive it from the state highway to -- on the lease road to

7    the location.

8        Q.  So without a CDL, if I'm understanding right, you

9    were allowed to transport the crane on the lease property,

10   the job site itself, but just not on public streets.  Am I

11   correct?

12       A.  That's correct.

13       Q.  But you only drove it one time.

14       A.  Yes.

15       Q.  So did you work as a relief operator at different

16   job sites all the time or were you going back to the same

17   job sites repeatedly?

18       A.  My position was to relief any operator at any

19   location in a 300 mile radius.  So I may have visited the

20   same operator's crane several times days and nights, so --

21   and on each occasion it was only two to four days duration

22   before they send me to relieve another operator.

23       Q.  Were you always based out of the Midland yard

24   with TNT?

25       A.  Yes.

Ronaldo Kramer
October 04, 2022                                      29

1      Q.  Do you remember ever asking a question about time

2   that you thought was marked off and not getting an answer?

3      A.  Yes, I did ask.  I worked these amount of hours,

4   I'm supposed to get paid these amount of hours and I

5   didn't get paid these amount of hours.  I'd call and have

6   a discussion with them and if I didn't -- they would

7   basically say, Well that -- that location didn't pay that

8   time when this location did.  So some locations just paid

9   different with their, I guess, TNT's contract with them.

10     Q.  So regardless of whether you agreed with it that

11  they would give you answers as to why they didn't give it

12  to you.  Am I understanding that right?

13     A.  They never answered my questions because as I see

14  it, I worked all these hours I should be getting paid for

15  these hours, and so like it got pretty frustrating towards

16  the end.

17     Q.  Was it frustrating because you didn't agree with

18  what they were -- what they were telling you about why

19  they were marking the time off?

20     A.  Of course it was, yes.  I'm not out there on

21  vacation.  I'm out there working and making -- working and

22  putting these hours in, had to get paid for them, you

23  know.

24     Q.  Did they always give you an explanation as to why

25  the time was marked off even if you didn't agree with that

1  explanation or thought it was wrong?

2      A.  Well that -- and I would always go to the

3  timekeeper lady.

4      Q.  To Carol Harrison you're talking about?

5      A.  Carol Harrison.  She would never -- she wasn't

6  very direct with any answers, and I remember her saying,

7  I'll get back to y'all on that.  It's so fast paced out

8  there and you're going and going and going and going.  And

9  I remember it was just on that location didn't cover that

10  -- cover that time or that location only paid a 12 hour

11  shift even though you're out there 16 hours, you know.

12              One of the locations only paid 10 hours a

13  day, but we were out there longer.  So but it would only

14  be a short duration for me because that operator would

15  come back to his crane and I'd head off to another crane

16  wherever that's be -- wherever that would be.  So I mean

17  it was -- it was a lot of confusion -- it was no confusion

18  for me to do my time because, you know, you call one of

19  the operator, How do you do your time on that, you know.

20      Q.  So that was Carol Harrison you were talking

21  about.  Who was your supervisor when you were working for

22  TNT, your direct supervisor?

23      A.  Levi Hastey.

24      Q.  Levi Hastey?

25      A.  Yes.

Ronaldo Kramer
October 04, 2022                                    31

1      Q.  Did you ever talk to Levi Hastey about these

2   issues that you just brought up that you were talking to

3   Carol about?

4      A.  I remember I was going to talk to him about it

5   the next time I was around the yard, but I don't think

6   that time ever came because I don't remember ever talking

7   to him about it.  Like I said, I was jumping, jumping

8   jumping, jumping, jumping everywhere.

9      Q.  Did you ever call him to talk about -- Levi?

10      A.  No.

11      Q.  Did you text him?

12      A.  I don't -- I don't remember.  I think I did text

13   him a couple of times.

14      Q.  Did you text him about hours and the time issues

15   that we were just talking about?

16      A.  That would have been the topic.

17      Q.  So to be clear do you remember sending him a text

18   about your time being marked out?

19      A.  I remember there was some text back and forth

20   about -- again, I think it was because of the -- whatever

21   location it was, whatever oil company it was that's the

22   way it was always explained is each oil company paid

23   different.

24      Q.  Do you remember him saying that in a text

25   message?

Ronaldo Kramer
October 04, 2022                                    34

1      A.  I believe it was eight hour pay.  One operator

2 said you got to take the company truck and you go home --

3 home on days off; and I think one of the operators told me

4 I got paid for time off, per your days off.  But I mean, I

5 don't know what you got, but I think it was only like

6 eight hours.  It was kind of understood.

7      Q.  Do you remember whether you got paid for that

8 time on the one time you went back to Alvin?

9      A.  I do not.  I remember them saying we're supposed

10 to get eight hours a day and per diem, $100 a day per

11 diem, but I don't -- I don't think -- I don't remember

12 ever getting paid for it.  That was kind of, like, cool

13 they did really pay us.

14      Q.  So you don't remember one way or the other?

15      A.  We're talking about five years ago.

16      Q.  Let's talk about per diems in man camps.  When

17 you were working for TNT out of Midland, did they give you

18 the option to stay in company provided lodging?

19      A.  No.  The only time we ever got a hotel and where

20 we got $35 a day and we had to put it on the company

21 credit card, and I had to do that once in Carlsbad.

22      Q.  So let's talk about that.  Whose decision was it

23 to stay in Carlsbad that time?

24      A.  That was the only place you can get a room at.

25      Q.  And was it your decision to stay out there

Ronaldo Kramer
October 04, 2022                                          35

1    instead of coming home or did TNT require you to stay out?

2        A.  No, I had -- it was too far of a drive to go all

3    the way to Midland.

4        Q.  Is that the only time that you stayed in a hotel

5    that you can remember when you were working for TNT?

6        A.  Yeah, I think so.  So I think because I like to

7    -- I tried to stay -- I remember trying to stay out of

8    company -- I kept -- I kept from -- I tired to keep from

9    having to go to get a hotel room and just driving some of

10   the locations, you know, that way I get my $100 a day per

11   diem and not just the 35 what they pay for it.  I put the

12   hotel on my company credit card.

13       Q.  So tell me about that.  When did you get a $100

14   per diem per shifts?

15       A.  What do you mean "when"?

16       Q.  You said sometimes you got 100 and sometimes you

17   got 35, so if you drove back after your shift, back to

18   Midland and stayed at your -- at your camper, which per

19   diem would you get?

20       A.  About 100.  It was only 35 if they provided a

21   hotel room.

22       Q.  So if you went back to Midland and stayed in your

23   camper you'd get $100 per diem?

24       A.  Yes.

25       Q.  And then if you stayed in a company provided

Ronaldo Kramer
October 04, 2022                                    36

1   hotel room you would get the --

2       A.  35.

3       Q.  If you stayed in a company provided lodging did

4   you get to put your travel down on your time sheet?

5       A.  Yes.

6       Q.  So you had the choice, if I'm understanding

7   right, to choose between staying at your camper in Midland

8   in between shifts overnight and getting the $100 per diem

9   on the one hand, and the other hand getting the $35 per

10  diem, the company provided lodging on the corporate card

11  and your travel being paid to and from the company

12  provided lodging.  Did I say all of that right?

13      A.  Let me break it down a different way here.

14      Q.  Sure.

15      A.  Back in those times you couldn't get a room for

16  -- a decent room for less 300 to $500 a night, the oil

17  boom back then.  When I went to Carlsbad it was 487 a

18  night.  I wasn't gone pay that out of my pocket, $400 a

19  day for that.  So of course I called dispatch and I only

20  had so much on the credit limit on my company card that

21  would cover for seven days.  You'll then get the seven

22  days it was better off, so they pay the week, how much

23  that was on them.

24      Q.  So when you were staying out in Carlsbad at that

25  hotel, TNT was paying for that hotel room, right?

Ronaldo Kramer
October 04, 2022                                    44

1      A.   That was the advantage on going to the yard

2  because your time started when you left the yard, from

3  what I understood.  So if you didn't go to the yard you

4  just put your time for when you left the camper like you

5  left the yard, the way we understood and, you know, a

6  reasonable amount.

7            Looks like we only got paid so much time --

8  we only got paid so much time to get to work so I mean, if

9  you tried to -- you tried to keep it in that time to

10  obviously make more money, you know, where it's more easy

11  on -- on us as the operators, you know to go way over here

12  to the yard when it's only going to pay you this much to

13  get to the location.  So, you know, go -- go this way, you

14  know.

15      Q.   So let's talk about both them.  If you went by

16  the yard would you start your time on the time sheet when

17  you got to the yard?  Am I understanding that right?

18      A.   Yes, I believe so.

19      Q.   And then if you were coming back and you went to

20  the yard after the job site, when would you stop your

21  time?  Was it when you got to the yard or when you left

22  the yard to go home?

23      A.   When I left the yard to go home.  If I did have

24  to go to the yard to pick up a spreader bar and the 20

25  foot lowboy trailer and haul it out to a location, wait

Ronaldo Kramer
October 04, 2022                                    51

1  got to keep stocked.

2      Q.  I learned about honey oil from the crane

3  operators in this case.

4      A.  I learned about it when I was out there because I

5  had never seen it.

6      Q.  I'm glad you had never seen it.

7              What I want to do now is just I'm going to go

8  through each of these things and talk about, like, how

9  often you had to get each of these things, okay.  Does

10  that make sense?

11      A.  Yes.

12      Q.  Okay.  So let's start with ice.  How often were

13  you getting ice?  Every shift?  Every other shift?  Once a

14  week?

15      A.  Every day.

16      Q.  Every day?

17      A.  Every day.  I didn't have a Yeti cooler, an $800

18  Yeti cooler that keep ices for weeks at a time.  Some of

19  them operators did but I didn't.

20      Q.  What was the eyes for?

21      A.  The cooler to keep water cold.  Which we go

22  through plenty of water because it just wasn't for us, it

23  was for whoever needed a water, you know, that was by my

24  truck --

25      Q.  Um-hmm.

Ronaldo Kramer
October 04, 2022                                          52

1        A.  -- wireline guys, coil tubing guys, whatever.

2   Whoever was around my truck then chuck water to them, you

3   know.

4        Q.  Did those guys bring their own water?

5        A.  I don't know.  I'm sure they did.  That's kind of

6   like the -- that was the norm out there, you know,

7   everybody bought their own water but, you know, if we

8   had -- happen to be just sitting there, you know,

9   between -- how do I call it?  In between transitions, when

10  you're transitioning off of one well to another well or

11  they're down the hole on one of them, we've got an hour or

12  so to kill and get a bite to eat, you know.

13       Q.  So you'd share water with anybody who wanted it?

14       A.  Yeah.

15       Q.  Would other folks share water with you if they

16  had it and you needed it?

17       A.  Oh, yeah.  I'm in a crane they'd bring me water.

18       Q.  Could you have brought ice from home?

19       A.  It was a 30 foot camper.  We didn't have an ice

20  machine.

21       Q.  What about water?  How often did you buy water?

22       A.  I probably didn't have to buy water maybe --

23  maybe once a week because when we got water we got them by

24  the cases and we kept them stocked.

25       Q.  Could you have just filled up a big cooler from

1    the tap at the camper?

2         A.   Absolutely not.

3         Q.   Why not?

4         A.   30 years ago I wouldn't mind drinking out of a

5    water hose, I wouldn't do it now.

6         Q.   Because you didn't trust the water --

7         A.   Oh --

8         Q.   -- at the camper to be clean?

9         A.   -- that's Midland.

10        Q.   Any other reasons or just you just didn't trust

11   the water?

12        A.   You can't really fill up a ice chest full of tap

13   water and ice.  You got sanitary issues, you'd have to dip

14   a cup in there, plus you've got all the -- if you've ever

15   been on a location you know what I mean.  It's just dusty,

16   dirty, oily, smelling.  I mean, you didn't drink nothing

17   out of a water cooler.  Nobody ever had a water cooler,

18   none of us did.

19        Q.   Did you get gallon jugs or litter bottle, pint

20   bottles?

21        A.   Just regular water bottles.

22        Q.   You pointing to like --

23        A.   Like this kind of water bottle.

24        Q.   The 17 ounce?

25        A.   The -- what is that, 12, 16 ounces.

Ronaldo Kramer
October 04, 2022                                        54

1    Q.  Yeah, you're pointing at it, like a 17 ounce

2   water bottle.  Alright.  Let's take about fuel for the

3   drag tank.  How often did you have to put fuel in the drag

4   tank?  Every shift?  Every other shift?  Every week?

5   Every month?

6    A.  Every day.  That was -- I had to keep it full.

7   Before I head to location I'd keep it full.  I would top

8   it off.  Sometimes it'd be 80 gallons, sometimes it would

9   40 gallons, whatever it was.  Whatever the crane needed I

10  kept the crane topped off.  And I would only top off the

11  crane at the end of the shift unless it needed some when I

12  got there, the other operator didn't have no fuel in his

13  drag tank so, alright, I'll top it off, just replace the

14  fuel when we come back in.

15   Q.  So when you say you top it off at the end of the

16  shift, do you mean --

17   A.  The crane.

18   Q.  You would move the crane -- you would move the

19  fuel from the drag tank to the crane?

20   A.  At the end of the shift, yes, sir.

21   Q.  How many gallons did the drag tank hold?  Was it

22  a 100 gallon tank?

23   A.  I believe it's 100 gallon but you're never going

24  to put 100 gallons of fuel in 100 gallon tank.  It's only

25  going to be about 90.

Ronaldo Kramer
October 04, 2022                                                    60

1   supplies.  When we got that we get everything we needed,

2   you know.

3        Q.  Did you keep --

4        A.  Maybe once a week, you know, as we need it pretty

5   much.

6        Q.  Now for the degreaser towels you had to go to n

7   autopart store for those?

8        A.  Most of the time.

9        Q.  So how often?

10       A.  Maybe once a week, every two weeks or so whenever

11  you could get them.  You know, a lot of the truck stops

12  don't sell those.

13       Q.  Would you go before you got to the job site on

14  the way to start your shift just like when you were

15  going --

16       A.  If I come across a parts house I'd dip in and go

17  get what I need if it was on the way.

18       Q.  Would you start your time sheet at the truck stop

19  if that was the first place that you went to?

20       A.  That's what we normally do.  Once you get to the

21  truck stop you start your time because you're in an

22  official capacity there.  Or if you -- depending on how

23  far the location was it -- it just kind of depends, you

24  know.  Normally you gave -- gave yourself -- some of them

25  paid a hour in, an hour out.  So I mean you try to

1  maintain that time so you ain't losing money.

2       Q.  What instance could you lose money?

3       A.  Well, you burn up that little bit of time you're

4  being paid for then you're going to lose money.  I try to

5  get there way sooner if I could to, you know, make more

6  money obviously.

7       Q.  And who told you how many hours were allocated

8  for each job?  Where did that information come from?

9       A.  The other operator that was on location he'd tell

10 me how that company does it, how they do it, and that's

11 how I would -- that's what I would go off of however that

12 operator was doing his time, I'd do my time.

13      Q.  Did you ever talk to any of the managers like

14 Levi Hastey or John or Carol Harrison about that?

15      A.  Didn't need to.  If my time sheet didn't look

16 like the daytime operator time sheet it would be some --

17 it would be some conflict there.

18      Q.  So if you had to stay late on the job site more

19 than the amount of time that the other operator had told

20 you for that job, what would you do in this instance?

21      A.  Add that time, roll over time.  If he didn't --

22 if he was running late -- if he was a couple hours late

23 and that's happened -- happens.  One operator hit a deer

24 and almost totaled out his truck, so I had to stay for

25 him, you know.  He was out in the middle of the rig, and

Ronaldo Kramer
October 04, 2022                                    62

1  one of them hit a cow.  So I mean you just -- you just add

2  that time till you're -- to you're -- till you're relieved

3  and whatever time they allowed you to drive -- to drive

4  home on.  I don't know, some of them they were all

5  different.

6        Q.  So let's transition and talk a bit about riggers.

7  Did you have to pick up riggers frequently as a relief

8  operator?

9        A.  It depend on the location.  I only remember the

10  Chevron locations we add to have a rigger, and I'll swing

11  by the yard and they leave the truck at the yard and I'll

12  pick them up.  Because you couldn't have your personal

13  truck on location, it had to be a company truck for

14  insurance reasons.  So that was -- that was every once in

15  a while.

16        Q.  Do you remember about what percentage of your

17  shifts involved a rigger?

18        A.  Not too much.  I liked the Chevron jobs they paid

19  the most.

20        Q.  And Chevron jobs didn't have riggers?

21        A.  Yeah, that was the one that had -- you had to

22  have a rigger.

23        Q.  Oh, you had to have a rigger?

24        A.  Yeah.

25        Q.  So you picked up a rigger in fewer than half of

Ronaldo Kramer
October 04, 2022                                    118

1                       CHANGES AND SIGNATURE
  RONALDO KRAMER                            OCTOBER 4, 2022
2
  PAGE      LINE         CHANGE            REASON FOR CHANGE
3
  _____
4 _____
  _____
5 _____
  _____
6 _____
  _____
7 _____
  _____
8 _____
  _____
9 _____
  _____
10 _____
   _____
11 _____
   _____
12 _____
   _____
13 _____
   _____
14 _____
   _____
15 _____
   _____
16 _____
   _____
17 _____
   _____
18 _____
   _____
19 _____
   _____
20 _____
   _____
21 _____
   _____
22 _____
   _____
23 _____
   _____
24 _____
   _____
25 _____

Ronaldo Kramer
October 04, 2022                                                    119

1       I, RONALDO KRAMER, have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4                                _____
                                      RONALDO KRAMER
5

6

7    THE STATE OF TEXAS*

8    COUNTY OF _____*

9            Before me, _____, on this day

10   personally appeared RONALDO KRAMER, proved to me under

11   oath or through _____) (description of identity card

12   or other document) to be the person whose name is

13   subscribed to the foregoing instrument and acknowledged to

14   me that they executed the same for the purposes and

15   consideration therein expressed.

16           Given under my hand and seal of this _____ day of

17   _____, 2022.

18

19

20                               _____
                                 NOTARY PUBLIC IN AND FOR
21                               THE STATE OF TEXAS

22

23

24

25

Ronaldo Kramer
October 04, 2022                                    120

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  MIDLAND/ODESSA DIVISION

 3  RONALDO KRAMER, LAYNE        §
    MATTHEWS, JEREMY NOBLES, and §
 4  JAMES PERHAM                 §
                                 §
 5       Plaintiffs,             §
                                 §  CIVIL ACTION NO.
 6                               §  MO:22-CV-0016
    vs.                          §
 7                               §
    TNT CRANE & RIGGING, INC.,   §
 8                               §
         Defendant.              §
 9

10

11  _____
                   REPORTER'S CERTIFICATION
12                    OF RONALDO KRAMER
                  TAKEN ON OCTOBER 4, 2022
13  _____

14

15            I, Angela Steele, Shorthand Reporter, Notary

16  in and for the State of Texas, do hereby certify that the

17  facts as stated by me in the caption hereto are true; that

18  the above and foregoing answers of the witness,

19  RONALDO KRAMER, to the interrogatories as indicated

20  were made before me by the said witness after being first

21  duly sworn to testify the truth, and same were reduced to

22  typewriting under my direction; that the above foregoing

23  deposition as set forth in typewriting is a full, true and

24  correct transcript of the proceeding has at the time of

25  taking of said deposition.
```

U.S. LEGAL SUPPORT, INC
713-653-7100

Ronaldo Kramer
October 04, 2022                                          121

1               I further certify that I am not in any

2    capacity, a regular employee of the party in whose

3    behalf this deposition is taken, nor in the regular

4    employ of this attorney; and I certify that I am not

5    interested in the cause, nor of kin or counsel to either

6    of the parties.

7               Certified to by me on this, the 4th day

8    of October, 2022.

9

10

11

12

13

14

15

16

17

18

19   _____

20   Angela S. Steele,
     Shorthand Reporter, Notary
21   Expiration:  10/17/23
     Firm Registration No. 001
22   U.S. LEGAL SUPPORT
     16825 Northchase Drive
23   Suite 900
     Houston, Texas 77060
24   (713) 653-7100

25